# MICHAEL DUPREE, JR.
# DEPOSITION TRANSCRIPT

UNITED STATES DISTRICT OF MICHIGAN

EASTERN DISTRICT OF MICHIGAN

MICHAEL DUPREE, JR., a Colorado

Resident, MICHAEL DUPREE, SR.,

and DARLENE DUPREE, his parents,

Residents of the Country Austria,

        Plaintiffs,

-vs-           Case No.:  2:10-CV-12094-LPZ-MKM

CRANBROOK EDUCATIONAL COMMUNITY,

JOHN J. WINTER, and CHARLES SHAW,

        Defendants.

_____/

        The deposition of MICHAEL DUPREE,

JR. was taken before Patricia A. Everett, CSR-4602, a

Certified Shorthand Reporter and Notary Public in and

for Oakland County, Michigan, (acting in St. Clair

County, Michigan), at 24825 Little Mack, St. Clair

Shores, Michigan, on the 10th day of January, 2011,

commencing at 10:05 a.m., pursuant to the applicable

Court Rules.

```
 1         depending upon the time of the year the rent fluctuates.
 2    Q.   And your current lease, how long is the lease for?
 3    A.   Current lease goes from the first of January -- or,
 4         actually, sorry, the 21st of December until the 20th of
 5         March.
 6    Q.   And your rent for this month is how much?
 7    A.   Seventeen hundred and fifty dollars.
 8    Q.   What is your date of birth?
 9    A.   Date of birth is August 27th of 1985.
10    Q.   Have you ever been a party to any other lawsuit, either
11         as a plaintiff or a defendant?
12    A.   Not to my knowledge.
13    Q.   Are you currently enrolled in any school?
14    A.   Yes, I am.
15    Q.   What school?
16    A.   The University of Denver's business department, business
17         program.
18    Q.   And you're currently taking classes for this term?
19    A.   Yes, at Daniels College of Business.
20    Q.   And when did you start attending the University of
21         Denver?
22    A.   Started attending the University of Denver about a year
23         and a half ago, so that would be September of 2008.  No,
24         wait, two and a half years ago, September of 2008.
25    Q.   And what is your status class wise there?
```

1  A.  A senior.

2  Q.  And what's your anticipated graduation date?

3  A.  Between March and June of this year.

4  Q.  Had you ever had your deposition taken before?

5  A.  No, sir.

6  Q.  What, if anything, have you done to prepare for this

7      deposition?  And I don't want to know anything you might

8      have talked to Chris about.

9  A.  Okay.  I flew out here from Denver, showed up today.

10 Q.  And when did you arrive from Denver?

11 A.  I arrived from Denver on a Southwest flight yesterday at

12     approximately about three p.m., I think.

13 Q.  Okay.  And did you look at anything to prepare for your

14     deposition?

15 A.  Like what?

16 Q.  Anything.

17 A.  Yes, I also pre-read my mother's deposition.

18 Q.  When did you read your mother's deposition?

19 A.  I briefly skimmed over it in the car on the way over

20     here this morning.

21 Q.  What else, if anything, have you looked at?

22 A.  Looked at some of the electronic discovery that we were

23     provided.

24 Q.  And what in particular did you look at?

25 A.  I'm not sure.

1        right?

2    A.   Yes, sir.

3    Q.   And you had a very brief discussion with your mom?

4    A.   Yes, sir.

5    Q.   Separate and apart from whatever discussions that you've

6         had with Mr. Sciotti, have you discussed this litigation

7         with anybody else?

8    A.   No, I have not.

9    Q.   Now, you -- the first college you went to after you were

10        dismissed from Cranbrook would have been Purdue;

11        correct?

12   A.   Yes, sir, that's correct.

13   Q.   And you would have been enrolled at Purdue in the fall

14        of 2004; right?

15   A.   Yes, sir, that's correct.

16   Q.   How long did you attend Purdue?

17   A.   Approximately a month and a half.

18   Q.   And why did you stop attending Purdue?

19   A.   I had severe illness.

20   Q.   Okay.  What was your illness?

21   A.   It started off as just, like, strep throat and kind of

22        progressed from there.  I'm not sure what the final

23        diagnosis or whatever you want to call it was, but it

24        was just very severe.  I was on a lot of different

25        antibiotics.  It didn't go away initially.  They had to

Page 14

1       try different antibiotics and stuff and it just

2       seriously impaired my ability to successfully complete

3       classes that quarter.

4  Q.  Did you treat with a doctor?

5  A.  Yes, sir, I did.

6  Q.  Do you remember the name of your doctor?

7  A.  No, sir, I don't.

8  Q.  The doctor you treated with, was that through Purdue?

9  A.  Actually, I believe that I saw a doctor both at home and

10     at Purdue relating to it, but I can't -- I don't

11     remember specifically.  I mean, this was a while ago.

12  Q.  All right.  Let's focus for a moment on the doctor you

13     saw at Purdue.  Was that a doctor through the Purdue

14     school?

15  A.  I don't recall.

16  Q.  And you saw a doctor at home?

17  A.  I believe so.  I mean, this is very difficult to

18     remember specifically.

19  Q.  Well, do you remember back in 2004 whether or not you

20     had a family doctor?

21  A.  No, I don't.  I do remember that I had just recently

22     turned eighteen and that my old doctor could no longer

23     see me because of the fact that I was no longer a minor.

24     So I don't believe at that time that I had a regular

25     doctor that I would regularly visit.

1   Q.   Now, I gather from what you're suggesting that you

2         withdrew from Purdue because of your illness?

3   A.   Yes, sir, that's correct.

4   Q.   And did you fill out any paperwork with Purdue to

5         indicate that you were withdrawing as a result of your

6         illness?

7   A.   Whatever paperwork was necessary, Purdue agreed with me

8         and allowed me to withdraw.  All my classes were in good

9         standing when I withdrew.

10   Q.   What courses were you taking at that time?

11   A.   I don't recall.  But I was enrolled in multiple classes,

12        and I wasn't failing any of them or anything like that.

13   Q.   After you withdrew were you under any medical care for

14        your illness?

15   A.   Yes, until I got better.

16   Q.   And when did you get better?

17   A.   I don't know exactly.  Probably another month or two.

18        It was not a -- you know, it wasn't a quick thing.

19   Q.   And while you were ill after you withdrew from Purdue

20        where were you living?

21   A.   I don't recall the entire -- everywhere that I lived,

22        but I mean, it was -- after withdrawing I went back to

23        Michigan.  I believe I spent a few days there and then I

24        ended up moving out to California.

25   Q.   So let me make sure I understand the chronology here.

1       So you spent a few days home after withdrawing from

2       Purdue.  Was that living with your parents?

3    A. I don't recall if I was living at my parents' house or

4       living at one of their other houses, but I was in

5       Michigan for a couple days.

6    Q. And then you moved out to California?

7    A. Yes, sir, that's correct.

8    Q. Where in California, Mr. Dupree, did you move to?

9    A. Initially we went out to Silicon Valley.  That was kind

10      of the starting place.  That was the goal, was let's

11      move to Silicon Valley and see if we can start something

12      there.  So we ended up in Livermore initially.

13   Q. Let's stop there.  I noticed you used the word "we".

14      Who would -- who would be we?

15   A. Me and two of my good friends from Purdue, all three of

16      us moved out to California in roughly the same period of

17      time.  Me and one of my friends went together and then

18      my second friend followed up.

19   Q. What were your friends' names?

20   A. Ryan Anderson and Michael Lowe, L-O-W-E.

21   Q. Now, you said initially you went to Silicon Valley, and

22      you identified the specific community as being

23      Livermore, and that was your goal to start something.

24      What were you planning on starting?

25   A. Well, the goal was to move to California and to --

1  Q.  Sure.  You've attended six colleges since you were

2      dismissed from Cranbrook.  The six colleges being Las

3      Positas, Cabrillo, Cal State University at Sacramento --

4      now I'm losing track.  University of California at Santa

5      Barbara and University of Denver, and Purdue?

6  A.  Yes, sir, that's correct.

7  Q.  And you're currently enrolled full-time at University of

8      Denver, with an anticipated graduation date of either

9      March or June of this year?

10 A.  Between March and June.

11 Q.  Okay.  But you are full-time enrolled at that school?

12 A.  Yes, sir.

13 Q.  Okay.  Before being full-time enrolled at the University

14     of Denver, what other schools, if any, were you enrolled

15     full-time at?

16 A.  All of them.  Oh, no, sorry, I take that back.

17     Everywhere except for Las Positas, where I only took two

18     or three, maybe four classes, and they weren't all at

19     the same time.

20 Q.  And the only job you had in California was working for

21     the public safety department at University of California

22     at Santa Barbara for about a month and a half; correct?

23 A.  Police department.

24 Q.  When you say police department, the University of

25     California at Santa Barbara calls their public safety

Page 35

1       their police department?

2  A.  No.  They have a police department on campus who also

3       entertains some public but not all public safety issues.

4  Q.  Who was your boss there?

5  A.  I don't recall.

6  Q.  And did you work there while you were enrolled in the

7       school?

8  A.  Yes, sir, I did.

9  Q.  Now, after you were dismissed from Cranbrook in June of

10      2004, did you obtain your GED?

11  A.  Yes, I did.

12  Q.  Do you remember, Mr. Dupree, when you obtained your GED?

13  A.  No, I don't.

14  Q.  Was it, if you recall, during the summer of 2004?

15  A.  I believe so.

16  Q.  How many years did you attend Cranbrook?

17  A.  Four.

18  Q.  And the grades would have been nine, ten, eleven and

19      twelve?

20  A.  Yes, sir, that's correct.  My entire high school career.

21  Q.  And your brother Matthew also attended Cranbrook;

22      correct?

23  A.  Yes.

24  Q.  And he graduated from Cranbrook?

25  A.  Yes.

Page 40

1          allegations about you having in your possession a pipe?

2    A.    Yes, I do remember that.  It wasn't specifically a

3          marijuana pipe at the time.

4    Q.    What was it?

5    A.    It was a pipe.

6    Q.    And do you remember telling the official at Cranbrook

7          that one of your fellow students gave you that pipe?

8    A.    Yes, I do.

9    Q.    Who was that student?

10   A.    I don't recall.

11   Q.    Do you remember telling anybody at Cranbrook that you

12         smoked marijuana?

13   A.    No, I don't.

14   Q.    Did you ever smoke marijuana while you were enrolled at

15         Cranbrook?

16   A.    Yes, I did.

17   Q.    How was it that Cranbrook found out that you had in

18         possession this pipe?

19   A.    I'm not sure of that to this day.  Maybe it was a setup.

20   Q.    Okay.  When you say maybe it was a setup, what's your

21         basis for that speculation?

22   A.    Your question.  Specifically how did they know that I

23         had the pipe?  I don't know.  I went to school in the

24         morning, I came out of my first class, set my backpack

25         down and John Winter came over and said, You come with

1    me.  And I went with him.  He said, No, bring your bag,

2    too.  And I brought my bag, and he says, Tell me if

3    there's anything in your bag.  I'm going to search it.

4  Q.  And did he search your bag?

5  A.  No, he did not.

6  Q.  Did you open the bag and show him the pipe?

7  A.  Yes, I did.

8  Q.  So you don't dispute the fact that you had in your

9    possession a pipe; correct?

10  A.  No, I don't.

11  Q.  And --

12  A.  Or, yes, that's correct, I guess.

13  Q.  All right.  And so the pipe -- your -- what you told

14    John Winter was the pipe was given to you by another

15    student?

16  A.  That's correct.

17  Q.  Did you ever tell Mr. Winter the identity of the

18    student?

19  A.  No, I did not.

20  Q.  And did you tell Mr. Winter why you had this pipe from

21    this student?

22  A.  I don't recall.

23  Q.  And what did Mr. Winter do with the pipe?

24  A.  I don't want to speculate.

25  Q.  So you don't know?

Page 42

1   A.   I don't know.

2   Q.   Okay.  Did you eventually have to meet with Mr. Winter

3        along with one of your parents pertaining to the pipe?

4   A.   Yeah, immediately.  He telephoned my mother and she came

5        directly up to the school.

6   Q.   Same day?

7   A.   Yes, sir, within the hour.

8   Q.   You said you briefly reviewed your mom's deposition?

9   A.   Very briefly.

10  Q.   Do you remember seeing anything in the deposition about

11       the meeting that took place, where you and your mom

12       attended with Mr. Winter about the pipe?

13  A.   Not specifically, no.

14  Q.   Were you aware that your mom testified that during that

15       meeting you walked out of the meeting?

16  A.   That is -- or, yes, I am aware of that fact.

17  Q.   And did you walk out of that meeting?

18  A.   Yes, I did.

19  Q.   Do you know after the meeting with John Winter that you

20       walked out of whether or not there was a conduct review

21       board hearing?

22  A.   No, I don't.

23  Q.   But you knew at some point that Cranbrook put you on

24       probation as a result of you having in your possession

25       the pipe?

Page 55

1       just because it's very tiring and you're in a plane full

2       of a bunch of people.

3                                   Other than that, I mean, I've had a

4       couple ear infections, I've had just basic stuff.  I

5       haven't had any -- no major hospitalizations, no cancer,

6       no nothing like that.

7   Q.  All right.  So to take your testimony a little bit

8       further, then, I'm assuming since June of 2004 up until

9       today you have not been hospitalized for any reason?

10  A.  Right.

11  Q.  All right.  Now, you said you've traveled a lot.  You've

12      already described to us the travels you did in December

13      of 2010.

14  A.  Yes.

15  Q.  Between June of 2004 and December of 2010, have you

16      traveled outside the United States for any extended

17      period of time?

18  A.  Yes, sir.

19  Q.  How many times?

20  A.  I've been to over fifty countries.  I spent over a month

21      in more than one of them.

22  Q.  All right.  Let's break this down, then.  So after you

23      left Purdue in the fall of 2004, in 2004, between the

24      time you left Purdue up until January 1 of 2005, did you

25      travel outside the country?

1  Q.  Did you fill out an application?

2  A.  Yes, sir, it was hand-submitted by Arlyce Seibert to the

3      president of Babson or whoever the director of Babson

4      is.  He's a Cranbrook alumni.

5  Q.  And were you accepted or rejected?

6  A.  I was whatever they call it, where they say we'll watch

7      you a little longer.  And then I was rejected.

8  Q.  Do you remember when it was that you were rejected?

9  A.  No, I don't.

10  Q.  Do you know why you were rejected by Babson?

11  A.  No, I don't.

12  Q.  Did you ever apply to Florida State University?

13  A.  Yes, I did.

14  Q.  And you would have applied to Florida State while you

15      were enrolled at Cranbrook; correct?

16  A.  I'm not sure.  I believe I've applied multiple times.

17  Q.  Have you applied to Florida State since you were

18      dismissed from Cranbrook?

19  A.  I'm not sure.  There's so many applications at schools.

20      It's just kind of all --

21  Q.  Blurs together, sort of?

22  A.  Very easily.

23  Q.  Now, why did you select Florida State?

24  A.  My father.

25  Q.  Were you ever accepted to Florida State?

1    A.    I don't recall.

2    Q.    Did you ever apply to Grand Valley State?

3    A.    I believe so, yes.

4    Q.    And why did you apply to Grand Valley State?

5    A.    My mother wanted me to go there.

6    Q.    And were you ever accepted to Grand Valley State?

7    A.    I'm not sure.  I believe I applied to there prior to

8          being dismissed from Cranbrook, though.

9    Q.    And you also applied to Purdue before you were dismissed

10         from Cranbrook; correct?

11   A.    I don't recall.  I know that originally I wasn't

12         planning to go there, even after I had been rejected

13         from Babson.

14   Q.    Well, do you remember what colleges you applied for

15         while you were enrolled at Cranbrook?

16   A.    The three we're talking about.  Other than that, let me

17         think here, Babson, Purdue, Grand Valley State.  I don't

18         recall, sorry.

19   Q.    Why did you apply to Purdue?

20   A.    My college counselor suggested it as a backup.  I don't

21         think I even initially applied there.  I think I applied

22         there after being rejected from Babson, but I'm -- this,

23         again, this is very long ago.

24   Q.    And when you say your college counselor suggested it as

25         backup, who would that have been?

Page 64

1   A.   Rencher.

2   Q.   Charlene Rencher?

3   A.   I believe so, yes.  I'm probably going to get one of

4        these names wrong, though.

5   Q.   That's okay.

6   A.   I haven't seen any of these people in five years and

7        I've had a dozen college counselors since then.

8   Q.   Have there been any colleges you have not applied to

9        because you obtained a GED?

10  A.   Yes.

11  Q.   What colleges?

12  A.   I don't recall the specifics.  That was one of the first

13       criteria we had to look at, because unfortunately I

14       wasn't issued a diploma.

15  Q.   So you can't tell us what colleges you did not apply to

16       because of the GED?

17  A.   No.  But I do specifically remember when we were looking

18       through colleges making, you know, a chart that showed,

19       you know, which ones required the diploma and which ones

20       don't and immediately, you know, disregarding the ones

21       that required a diploma.

22  Q.   All right.  Now, you applied to a number of schools in

23       the University of California school system; correct?

24  A.   Yes, sir.

25  Q.   And did any of those schools indicate that you would not

1        be accepted because you had a GED?

2   A.   I don't recall.

3   Q.   Did you ever apply to George Washington University?

4   A.   Sounds familiar.

5   Q.   Well, does that mean you did apply?

6   A.   Yes, I believe so.  Yes, I did.

7   Q.   Do you remember when you applied?

8   A.   No, sir, I don't.

9   Q.   Do you know what happened to your application?

10  A.   No, sir, I don't.

11                      MR. LINDEN:  Let's mark this Exhibit

12       3, please.

13                      (At 11:38 a.m. Deposition Exhibit

14                      No. 3 marked for identification)

15                      MR. LINDEN:  Let the record reflect

16       that Mr. Dupree has been handed what has been marked by

17       the court reporter as Exhibit 3, which for purposes of

18       identification is a June 19, 2008 letter from George

19       Washington University addressed to Mr. Dupree.

20       BY MR. LINDEN, CONTINUING:

21  Q.   After you've had a chance to read that document, let me

22       know, Mr. Dupree, and I'll have a handful of questions

23       to ask you.

24  A.   Okay.  (Witness complying).  I've read it.

25  Q.   Have you seen this document before?

1  A.  I'm unsure. I don't recall.

2  Q.  Do you recall if this is a document you produced in this

3      case?

4  A.  I didn't produce any of the documents in this case.

5  Q.  You have not provided any documents to your attorney to

6      have them produced in this case?

7  A.  Not to my knowledge.

8  Q.  Now, this letter indicates that you were rejected by

9      George Washington University; correct?

10  A.  Yes, sir.

11  Q.  And does this refresh your memory that you actually

12      applied to George Washington University?

13  A.  Yes, sir, it does.

14  Q.  And do you now recall applying to George Washington

15      University sometime in 2008?

16  A.  Yes, sir.

17  Q.  And the letter that you have in front of you, Mr.

18      Dupree, indicates a Vienna address; correct?

19  A.  Yes, sir, that's the correct address of my parents in

20      Austria.

21  Q.  And do you know why the rejection letter was being sent

22      to your parents' address at the time?

23  A.  That was my permanent address.

24  Q.  That was your permanent address in 2008?

25  A.  Yeah, that's my permanent address today.

1   Q.   How long has it been your permanent address?

2   A.   Since my family moved from Michigan to Austria, at which

3        time my home moved from Michigan to Austria.

4   Q.   And when did your parents move to Vienna?

5   A.   I'm not sure.  Four or five years ago.

6   Q.   Do you know why you were rejected by George Washington

7        University?

8   A.   No, sir, I don't.

9   Q.   Do you recall ever applying to Rollins College?

10   A.   Yes, sir, I do.

11   Q.   Do you recall, Mr. Dupree, when you applied to Rollins?

12   A.   No, sir, I don't.

13   Q.   By the way, why did you apply to George Washington

14        University, if you remember?

15   A.   I don't remember.  Sorry.

16   Q.   Do you know why you applied to Rollins College?

17   A.   I don't recall.  Sorry.

18   Q.   Okay.

19                     MR. LINDEN:  Let's mark this Exhibit

20        4.

21                     (At 11:41 a.m. Deposition Exhibit

22                     No. 4 marked for identification)

23        BY MR. LINDEN, CONTINUING:

24   Q.   All right.  I'm going to hand you now, Mr. Dupree,

25        what's been marked by the court reporter as Exhibit 4,

1      which is a letter for purposes of identification from

2      Rollins College addressed to you at the Vienna address,

3      dated June 2, 2008.  Take whatever time you need to read

4      it and I'll have, again, a few questions for you about

5      this document.

6  A.  (Witness complying).  Okay.  I've read it.

7  Q.  Have you seen this document before?

8  A.  I'm unsure.

9  Q.  Okay.  But you would agree this letter indicates that

10     Rollins College was rejecting your application in June

11     of 2008?

12  A.  Yes, sir, that's correct.

13  Q.  Do you know why Rollins College rejected your

14     application?

15  A.  I would assume because I don't have a high school

16     diploma.

17  Q.  Well, it's interesting that you say that you assume

18     that.  Is there anything in that letter that says you're

19     being rejected because you don't have a high school

20     diploma?

21  A.  No, but that's still what I think.

22  Q.  Well, let's talk some more about that.  Did anybody at

23     Rollins College tell you that your application was being

24     rejected because you did not have a high school diploma?

25  A.  I don't recall.

1   Q.   Did you ever talk to anybody in the admissions

2        department at Rollins College?

3   A.   I don't recall.

4   Q.   Okay.  So you would agree that you can't recall anybody

5        at Rollins College ever telling you that they were

6        rejecting your application because you did not have a

7        high school diploma; correct?

8   A.   Correct.

9   Q.   Okay.  Did you ever apply to American University?

10  A.   I'm not sure.

11                      MR. LINDEN:  Let's mark this Exhibit

12        5.

13                      (At 11:43 a.m. Deposition Exhibit

14                      No. 5 marked for identification)

15  BY MR. LINDEN, CONTINUING:

16  Q.   I'm now going to put in front of you, Mr. Dupree, what's

17       been marked Exhibit 5 by the court reporter for purposes

18       of identification.  It's a letter addressed to you at

19       the Vienna address from American University dated June

20       11, 2008.  Take whatever time you need to read this and,

21       again, I'll have some questions for you about it.

22  A.   Okay.  I've read it.

23  Q.   Have you seen this before?

24  A.   I'm not sure.

25  Q.   Okay.  You would agree this letter indicates to you that

1    your application to attend American University was being

2    rejected; correct?

3  A.  Yes, sir.

4  Q.  Do you remember if you talked to anybody in the

5    admissions department at American University?

6  A.  I don't, no.

7  Q.  Do you know why your application was being rejected by

8    American University?

9  A.  Again, I assumed because I didn't have diploma.

10  Q.  Well, let's explore a little bit further this assumption

11    you want to make.  What's your basis for that

12    assumption?

13  A.  The basis for that assumption is that I have a

14    disadvantage when applying to a school from a GED as

15    opposed to a diploma and that colleges accept more

16    students with diplomas than they do GEDs.  Your chances

17    of getting accepted are higher if you have a GED --

18    rather, a diploma than if you have a GED.

19  Q.  Does this letter from American University indicate that

20    your application was being rejected because you have a

21    GED?

22  A.  No, sir, it does not.

23  Q.  Did anybody at American University tell you your

24    application was being rejected because you have a GED?

25  A.  I don't recall.

Page 76

1    Q.   So you've had a chance to finish reading page two of

2         Exhibit 7; right?

3    A.   Yes, sir.

4    Q.   Does it refresh your memory as to why you were

5         interested?

6    A.   Yes, sir.

7    Q.   And what was the reason?

8    A.   The primary reason was that the school I was currently

9         attending, which was University of California, Santa

10        Barbara, only offered a business management economics

11        program, which is really like an accounting

12        concentration.  And I'm not really as interested in

13        business in the capacity of the numbers as I am the

14        entrepreneurialship and stuff like that.

15                      So I was trying to progress from a

16        business management/economics/accounting concentration

17        program that I was currently enrolled in into a business

18        management administration program, such as the one I'm

19        currently enrolled in.  I was trying to find a more

20        suitable business program for myself.  Also a few other

21        less important details, such as I was trying to find a

22        smaller school, you know, a few things like that.

23   Q.   Do you know whatever happened to your application at the

24        University of San Diego?

25   A.   It was denied, rejected.

1       but you couldn't recall all the schools you might have

2       been interested in attending; correct?

3  A.   Yes, sir, that's correct.

4  Q.   All right.  If you would, Mr. Dupree, why don't you turn

5       to the very last page of this document?

6  A.   Yes, sir.

7  Q.   And you see that this reflects that the campus and the

8       University of California system that you were interested

9       in attending would have been the campuses in Berkley,

10      Los Angeles, San Diego, Santa Barbara and Santa Cruz.

11      Do you see where I'm referring to?

12  A.  Yes, sir, I do.

13  Q.  Does this refresh your memory that those were the

14      schools that you were interested in attending in the

15      University of California system?

16  A.  Yes, sir, at least those schools.

17  Q.  Do you know whatever happened to your application to the

18      Berkley campus?

19  A.  I'm not sure, no.

20  Q.  Do you know whatever happened to your application with

21      respect to the Los Angeles campus?

22  A.  Yes, I was rejected.

23  Q.  Did you receive a letter of rejection from the Los

24      Angeles campus?

25  A.  I don't recall.

1  Q. Did you speak to anybody in admissions who told you why

2     you were being rejected?

3  A. No, sir.

4  Q. Now, what about San Diego?  What happened to your

5     application for the San Diego campus, if you know?

6  A. I don't recall on that one.

7  Q. The Santa Barbara campus you were accepted to; correct?

8  A. I don't believe on this application.  Because this is in

9     '06.  I don't believe I was accepted to Santa Barbara

10    until, oh, this is, yeah -- that's right, 12/1/06, so,

11    yeah, I was accepted in '07 then.

12 Q. So you were accepted to University of California at

13    Santa Barbara; correct?

14 A. I'm not sure if this is the application that was

15    accepted or not.  One of my applications was accepted,

16    yes.

17 Q. All right.  But we would agree -- so the record is

18    clear, at some point you were accepted by the University

19    of California at Santa Barbara and you attended that

20    school?

21 A. Yes, sir, that's correct.

22 Q. Okay.

23 A. I'm just not sure if this is -- it's so hard to remember

24    what's what.

25 Q. All right.  And so what about this Santa Cruz campus?

1       have a Bates CB000248?

2    A.   Yes, sir.

3    Q.   Is this also your writing?

4    A.   Yes, sir.

5    Q.   Now, I want to come back to something that we talked

6       about briefly earlier today.  You seem to be suggesting

7       that it's your belief that there were colleges you did

8       not apply to because you have a GED as opposed to a

9       diploma.  Do you recall that?

10   A.   Yes, sir.

11   Q.   But you can't identify any college you did not apply to

12      because of a GED; correct?

13   A.   Not off the top of my head.

14   Q.   How did you find out you were being dismissed from

15      Cranbrook?

16   A.   I think the time I found out is when my father and I

17      were both in Winter's office and Winter told my

18      father -- I remember this specifically, actually.  He

19      said, You can either withdraw Michael now or we're going

20      to dismiss him.  And then --

21   Q.   Is this is something John Winter told you?

22   A.   Something he told my father; I was just in the room.

23   Q.   In your presence?

24   A.   Yes.

25   Q.   Do you remember when that was?

1    Michael Dupree, and he needs to search their car, too.

2    And this was someone I didn't even know so it was very

3    embarrassing to have him going up to other students that

4    I go to school with and saying, hey, don't worry, we're

5    just looking for Michael Dupree's drugs, essentially.

6                Then after they didn't find any

7    drugs, because obviously there weren't any, they

8    searched everything very well, both Pickett and Winter,

9    the rest of the students were dismissed and I was asked

10    to join them in Winter's office.  I don't remember

11    exactly what the meeting was about then -- it wasn't

12    about computer passwords, it was about drugs, but there

13    was no real -- I don't know what the result or anything

14    of it was.  I didn't have any drugs.  There was no --

15    so, yeah.

16  Q.  Who were you in the car with when this happened?

17  A.  I don't remember.

18  Q.  Do you know a student by the name of Ali?

19  A.  Yes, sir.

20  Q.  What's Ali's last name?

21  A.  Mahmood.

22  Q.  Now, you indicated earlier in the deposition that during

23    your senior year at Cranbrook you smoked marijuana;

24    right?

25  A.  Yes, sir.

Page 102

1   Q.   Did you use any other drugs, illegal drugs while you

2         were enrolled at Cranbrook as a senior?

3   A.   Alcohol.

4   Q.   Alcohol.  Well, you were a minor; right?

5   A.   Yes, sir.

6   Q.   Did you ever sell drugs to any students while you were

7         at Cranbrook?

8   A.   I don't recall.

9   Q.   Did you ever give anybody marijuana while you were a

10        student at Cranbrook?

11   A.   Yes, I did.

12   Q.   Okay.  Who did you give marijuana to?

13   A.   I don't recall.

14   Q.   Now, with respect to alcohol, you were a minor.  You

15        didn't turn eighteen until after leaving Cranbrook;

16        correct?

17   A.   I think I might have been eighteen my senior year.

18   Q.   Did you ever get any alcohol for any minors during your

19        senior year at Cranbrook?

20   A.   No, sir, and you can't buy alcohol once you're eighteen.

21        You have to be twenty-one.  So my entire time I was at

22        Cranbrook I could not purchase alcohol, give alcohol.

23   Q.   Did you ever have a false identification?

24   A.   No, sir.

25   Q.   But you said you drank while you were enrolled at

Page 104

1    A.   I don't believe so, no.

2    Q.   All right.  So let's focus, if we could -- I think you

3         used the term "the computer ordeal"?

4    A.   Yep.

5    Q.   Okay.  Let's talk about the computer ordeal.

6    A.   Okay.  So -- yeah, I'm sorry, I didn't finish my story

7         on Winter and Pickett.  So the next time I saw Winter

8         and Pickett I believe it was the same day.  This is

9         prior to my science class.  Then about three-quarters of

10        the way through my science class, I'm pulled out of

11        class and told to go to Winter and Pickett's office --

12        or, I'm sorry, Winter's office, where Pickett was also.

13                        At this point I go into the office

14        and I sit down and I'm asked to sit and wait with the

15        secretaries.  At this point the secretaries kind of tell

16        me that Randy Bruder, you know, had gotten in trouble

17        for sharing because -- not for sharing computer

18        passwords, for hacking into faculty accounts or

19        something like that.  And that he had told Winter that I

20        had nothing to do with it and he just felt really bad

21        and felt really sorry about it.  And that's just what

22        they had heard from Randy while he was sitting out there

23        ten minutes before.  So they were just telling me what

24        he'd told them.

25   Q.   This is a secretary telling you this?

Page 109

1    A.    Yes, sir.

2    Q.    Who brought that up?

3    A.    Mr. Winter did.  He asked me directly if I had shared my

4          computer password with Randy in the beginning of the

5          year and I said, yes, I have, because I had.

6    Q.    Did Winter explain to you how he -- what prompted him to

7          ask you that question?

8    A.    There was no explanation necessary.  He did not know and

9          there was no explanation necessary.  It was the first

10         thing he asked.  I came in and he said -- you know, I

11         considered John Winter to be a friend, you know, kind of

12         a guardian, if you will, someone who I requested and was

13         kind of like my mentor and I trusted him.  I didn't

14         think that I needed to be careful what I was saying or

15         ever, you know, be dishonest.  He asked me a simple

16         question, I gave him a simple, honest answer, and then

17         he -- yeah.

18   Q.    And you said this meeting lasted about a half an hour?

19   A.    I'm not sure.  It was not a long meeting.

20   Q.    So what did you do after that meeting?

21   A.    I don't remember.  I think I was told to go home.

22         Either that or my parents were called or -- I don't know

23         exactly.

24   Q.    Okay.  So putting aside that you can't recall exactly

25         what you did, did you then again meet with Winter either

1      BY MR. LINDEN, CONTINUING:

2  Q.  Mr. Dupree, the court reporter has handed you what has

3      been marked Exhibit 12, which for purposes of

4      identification is a June 1, 2004 letter addressed to

5      your parents from John Winter, and it's Bates stamped

6      CB00024.  After you've read this letter, I'll have some

7      questions for you.

8  A.  (Witness complying).  I'm ready.

9  Q.  Have you seen this document before?

10  A.  No, sir.

11  Q.  Were you living with your parents at the beginning of

12      June of 2004?

13  A.  Yes and no.  I mean, this was my last month of senior

14      year of school.  I wasn't exactly at home studying every

15      night for six hours.

16  Q.  Well, my question wasn't whether or not you were home

17      each night studying for six hours.  Were you living with

18      your parents in June of 2004?

19  A.  Yes, I was.

20  Q.  Okay.  And their primary residence at the time was the

21      Martell address; is that correct?

22  A.  Yes, sir, that's correct.

23  Q.  And so you've never seen this letter before, Exhibit 12?

24  A.  No, sir.

25  Q.  You haven't even seen this since this lawsuit was filed?

1    explained to your parents why your transcript noted

2    withdrawal?

3    A.   I've read that it was -- no, I don't know why.

4    Q.   Well, you were in the midst of saying that you've

5         read --

6    A.   I've read that Mr. Shaw thought -- I think it was in my

7         mother's diposition --

8    Q.   Deposition?

9    A.   Deposition, sorry.

10   Q.   That's okay.

11   A.   That I think she had said -- or, that she had said that

12        Shaw had said that it was for my better that it was

13        inaccurate.  That it would be better that it showed

14        dismissed than withdrawn.

15                        MR. LINDEN:  Let's take a break for

16        a second.

17                        (Recess from 1:42 p.m. to 1:53 p.m.)

18   BY MR. LINDEN, CONTINUING:

19   Q.   Mr. Dupree, were you ever aware of any kids getting

20        picked up in your neighborhood for using drugs?

21   A.   Yeah, Andrew Minor and a few of his friends.

22   Q.   Do you remember when that was?

23   A.   No.  End of the school year at some point.

24   Q.   End of your senior school year?

25   A.   I believe so, yes.  Not, like, the last day, but the

Page 116

1    last semester.

2  Q.  Can you identify any college that rejected you because

3       you have a GED as opposed to a diploma?

4  A.  I don't believe I got into USD because I didn't have a

5       diploma.

6  Q.  Well, putting aside the fact that you believe that, do

7       you -- can you point to either a document or somebody

8       who told you you did not get in because you have a GED

9       as opposed to a diploma?

10  A.  I couldn't get any further reason from anyone as to why

11      I didn't get in.

12  Q.  Well, did anybody -- and when you say USD, just so the

13      record is clear on that, we're talking about the

14      University of San Diego; correct?

15  A.  Yes, sir.

16  Q.  Did any -- did you ever get a letter from the University

17      of San Diego saying that you were being rejected because

18      you had a GED and not a diploma?

19  A.  No explanation was ever given.

20  Q.  Was any explanation given to you verbally as to why you

21      were rejected?

22  A.  No, sir.

23  Q.  So it's still your belief that's why you got rejected

24      because you have a GED?

25  A.  Right.

Page 117

1    Q.    Now, coming back to the computer situation at Cranbrook,

2          did anybody at Cranbrook ever threaten you with criminal

3          prosecution with respect to that?

4    A.    Yes, sir.

5    Q.    Who threatened you?

6    A.    Either John Winter or Mr. Pickett or both of them.  I

7          don't remember who actually said that, you know, the

8          actual words, but they were both in the room and they

9          were both talking about how what I was doing could be a

10         crime.  And then it came out if I didn't cooperate I

11         would be prosecuted.

12   Q.    All right.  So you can't remember who said it, it was

13         either Pickett or Winter?

14   A.    Or both.  Because they were both speaking about it at

15         the same time, basically finishing each other's

16         sentences almost.

17   Q.    Okay.

18   A.    And I don't remember exactly who was doing the

19         threatening in particular, but ....

20   Q.    All right.  One of them or both of them opined that this

21         was a violation of federal law?

22   A.    Yes.

23   Q.    And that unless you cooperated with regard to their

24         investigation you could be prosecuted?

25   A.    Right.

Page 130

```
 1          My advisor and advocate who tried to speak on my behalf
 2          was told to shut up, and after that things didn't get
 3          much better, either.
 4     Q.   Are you familiar with the Cranbrook community handbook?
 5     A.   Yes, sir.
 6     Q.   And did you ever receive a copy of that community
 7          handbook during your senior year?
 8     A.   I was familiar with it.  I don't know if I received a
 9          copy or ....
10     Q.   And do you know if the community handbook spells out a
11          specific procedure for how the conduct review board is
12          supposed to be conducted?
13     A.   No, sir, I'm not sure if it does or not.  I was just
14          citing from my previous experience with more than one
15          conduct review board.
16     Q.   Are you aware of any document at Cranbrook that spells
17          out a specific procedure for how the conduct review
18          board is supposed to be held?
19     A.   Not that I'm aware of, no.
20     Q.   Are you aware of any document at Cranbrook that spells
21          out that you're to be guaranteed a specific
22          representative to represent you at the conduct review
23          board?
24     A.   No, sir, but it's common -- well, yeah, yeah, in
25          practice there's no document that states it, no.
```

Page 131

1   Q.   All right.

2   A.   Not that I'm aware of.  I'm sure there is one.

3   Q.   Are you aware of any document from Cranbrook that spells

4       out that you're supposed to be entitled to a certain

5       specific amount of time to prepare for a hearing before

6       the conduct review board?

7   A.   No, I just feel that that's part of due process in a

8       contract.  When you sign a contract with somebody,

9       they're obligated to give you -- you know, to let you

10      appeal things, to give you a fair hearing, if they say

11      that you get a hearing, et cetera.

12  Q.   Let's talk about this expectation you've just described.

13  A.   Yes, sir.

14  Q.   What's the source of that expectation?

15  A.   I signed a contract.  I expect -- you know, when I sign

16      a contract with an organization like a school, I expect

17      it's a professional relationship and that things will be

18      treated professionally.  Having Winter put his hands

19      over his ears and screaming, having my advocate being

20      told to sit down and shut up are not professional.

21  Q.   Let's talk about the contract that was signed.  Did you

22      ever sign a contract while you were at Cranbrook?

23  A.   No, sir.

24  Q.   Now, you're aware that your parents signed an enrollment

25      agreement for Cranbrook; correct?

Page 132

1   A.   I believe my father did, yes.

2   Q.   But you never signed a contract; right?

3   A.   I don't believe so, no.  I don't think I could.  I was

4        under eighteen.

5   Q.   All right.  Now, Mr. Dupree, the next thing I want to

6        talk about with respect to your allegations of claims of

7        wrongdoing by Cranbrook, you referenced the fact that

8        it's your belief that Cranbrook designated your

9        departure as a withdrawal as opposed to a dismissal to

10       circumvent your ability to appeal?

11  A.   That's one of my beliefs.  I'm not really sure why they

12       did it, but, you know, the way I look at it is it's

13       fraudulent.

14  Q.   Okay.  But regardless, you just indicated you don't know

15       why they characterized it as a withdrawal as opposed to

16       a denial?

17  A.   I was told --

18  Q.   Dismissal.

19  A.   I was told because it was supposed to look better for

20       me.

21  Q.   Okay.  And who told you that?

22  A.   My mother told me that that's what Shaw had told her.

23  Q.   And when did your mom tell you that?

24  A.   When this was all going on, end of May of 2004.

25  Q.   Okay.

1    your testimony, you're saying that because the

2    transcript indicated you withdrew, that's why you were

3    denied admission to the University of San Diego; right?

4    A.   It very well could be.

5    Q.   You say could be.  That suggests that you're speculating

6    in that regard; is that correct?

7    A.   Yes, sir.

8    Q.   And this college counselor you had, you don't remember

9    her name; right?

10   A.   No, I don't.  Sorry.

11   Q.   When's the last time you had any communication with her?

12   A.   A couple years ago.  The company is called College

13   Connections.  I do remember that.

14   Q.   Do you know where they were based out of?

15   A.   No, sorry.

16   Q.   How did you find out about College Connections?

17   A.   I found them on the Internet.

18   Q.   All right.  So other than your speculation, you have no

19   facts to support your belief that you were denied

20   admission at the University of San Diego because your

21   transcript indicated that you had withdrawn from

22   Cranbrook; correct?

23   A.   Correct.

24   Q.   Okay.  Other than what we've just gone through; what

25   else is it that you're claiming Cranbrook did wrong?

1      withdrew; right?

2  A.   Right.

3  Q.   All right.  With the repeated sending out of the

4      transcript, that's been at either your request or your

5      family request; correct?

6  A.   Correct.  And we've repeatedly asked them to correct the

7      errors and we've repeatedly asked them to correct the

8      errors on it and they've repeatedly continued to send

9      out the falsified transcript over and over and over

10     again.

11  Q.  All right.  I appreciate the fact that you wanted to add

12     something that's not responsive to my question, but

13     we'll follow up on that.

14  A.  Okay.

15  Q.  Have you provided a written explanation to any of the

16     institutions that your transcript got sent to that you

17     contest the fact that the transcript notes that you

18     withdrew from Cranbrook?

19  A.  I don't recall.

20  Q.  Do you know if anyone acting on your behalf has done

21     that?

22  A.  I don't know for sure.  Potentially, yes.

23  Q.  But you don't know that for certain, do you?

24  A.  No.

25  Q.  I have no more questions.  Thank you for your time.