# DARLENE DUPREE
# DEPOSITION TRANSCRIPT

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN


MICHAEL DUPREE, JR.,              Case No.

a Colorado Resident,

MICHAEL DUPREE, SR.,          2:10-CV-12094-LPZ-MKM

and DARLENE DUPREE, his parents,

Residents of the Country of Austria,

     Plaintiffs,

     vs.

CRANBROOK EDUCATIONAL COMMUNITY,

JOHN J. WINTER, and CHARLES SHAW,

     Defendants.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _/

        The Deposition of DARLENE DUPREE, a

Plaintiff in the above-entitled cause, taken by

Shari J. Pavlovich, CSR-5926, Certified Shorthand

Reporter, Registered Professional Reporter,

Certified Realtime Reporter, and Notary Public for

the County of Wayne, acting in the County of

Oakland, State of Michigan, at 38500 Woodward

Avenue, Suite 100, Bloomfield Hills, Michigan, on

Thursday, December 16, 2010 commencing about 10:35

a.m., pursuant to the Federal Rules of Civil

Procedure.

1   Q   And when was the -- when you say "CRB" so the

2       record's clear, we're talking about conduct review

3       board; correct?

4   A   Right.

5   Q   When did you return from the conduct review board?

6       What would have been the date?

7   A   The 27th.  And we got back to the house about 5:30.

8   Q   You as parents were not a allowed to participate in

9       the conduct review board; correct?

10  A   Correct.

11  Q   What's the next meeting reflected in your notes?

12  A   Well, I don't know if it was a meeting, per se, but

13      after the conduct review board we approached

14      Dr. Lorey to ask him how it went.  And he basically

15      just fielded us and didn't answer any questions.

16                  Then we went immediately at that

17      time, which is I have in my notes approximately

18      5 o'clock, to Arlyce' office.  My husband had asked

19      what the appeal process was.  And there didn't seem

20      to be one.  So he wanted to question Arlyce about

21      that issue.

22  Q   All right.  Let me interrupt.  So did you meet with

23      Arlyce Siebert after the conduct review board

24      hearing on May 27th?

25  A   We did not.  We got to the office.  She was there.

1       The door was open. We could see she was there. The

2       secretary spoke with her. She kind of nodded to us

3       and said that we would meet -- the secretary came

4       back out and said we would have a meeting at

5       10 o'clock the next morning, which would have been

6       Friday, the 28th.

7   Q   Is the next meeting reflected in your notes, the

8       next meeting with Arlyce Siebert on the 28th?

9   A   Yes.

10  Q   That meeting took place at 10 a.m.?

11  A   In Arlyce' office.

12  Q   Who was present at that meeting?

13  A   Mike, Michael, and I all went; however, Arlyce

14      requested that Michael wait out in the secretary's

15      office.

16  Q   How long did you and your husband meet with Arlyce

17      Siebert on the 28th?

18  A   I would say about an hour.

19  Q   And this meeting is reflected in your notes?

20  A   Yes.

21  Q   What's the next meeting reflected in your notes?

22  A   A meeting with Shaw, Pickett, and Winter. When we

23      were in the meeting with Arlyce, she said that she

24      was convinced that they had proof that he was

25      involved but that she didn't know what it was. She

1  Q   All right.  Now, today you've been referring to that

2      calendar that's in front of you and you indicated

3      before that's a calendar for 2004.  Did you -- the

4      notations that I can see from across the table that

5      are on the calendar, were those notations made

6      contemporaneously at the time?

7  A   Yes.

8  Q   Could I see your calendar for a moment, please?

9  A   Yes.  This one Chris gave me the other day because I

10     need the calendar to get the dates straight.

11                    MR. LINDEN:  Let the record reflect

12     that Mrs. Dupree has handed me a calendar book that

13     is for Purdue University, Krannert School of

14     Management 2004 planner.

15 BY MR. LINDEN:

16 Q   Now, I've turned the page to look at the month of

17     June 2004.  You have no notations on that month, do

18     you?

19 A   No.

20 Q   Okay.  Let me ask you some background questions,

21     Mrs. Dupree.  You currently live in Austria with

22     your husband?

23 A   Yes.

24 Q   And this is your first and only marriage?

25 A   Yes.

Page 19

```
 1   A    I'm not sure it's a lawsuit but I had a problem with

 2        a rental situation where someone was renting my

 3        house and I had to go to court to have them evicted.

 4   Q    All right.  And where was this?

 5   A    Atlanta, Georgia.

 6   Q    And when would this have been?

 7   A    '80.

 8   Q    And when you said you had to go to court, that would

 9        have been court in Atlanta, Georgia?

10   A    Right.

11   Q    Would that have been Cobb County or Fulton County?

12   A    Dekalb, D-E-K-A-L-B.

13   Q    And besides that legal matter or proceeding, have

14        you been involved in any other legal proceedings?

15   A    No.

16   Q    Have you ever testified anywhere before?

17   A    No.

18   Q    Now, during the time Michael was enrolled at

19        Cranbrook did you ever sign any enrollment

20        agreements?

21   A    I believe that both of us signed the enrollment

22        agreements each year.

23   Q    Okay.  I'm going to show you what was previously

24        marked as Exhibit 1, which is the enrollment

25        agreement for Michael for the school year 2003-2004.
```

Page 20

```
 1        You would agree you did not sign that agreement?

 2   A    I'm sorry.  I did not sign this.  It's only signed

 3        by one parent.

 4   Q    Okay.  And let's talk for a moment briefly about

 5        your son Matthew.  He graduated from Cranbrook in

 6        2007?

 7   A    Right.

 8   Q    And so he obviously continued to be enrolled at

 9        Cranbrook after your son was dismissed; correct?

10   A    Yes.

11   Q    And let's talk about Michael's education since he

12        was dismissed from Cranbrook.  Your husband, when he

13        testified on Tuesday, indicated that Michael dropped

14        out or withdrew from Purdue in the fall of 2004

15        because of an illness?

16   A    Right.

17   Q    What was the nature of the illness?

18   A    I think it was mono.

19   Q    When you think it was mono, was he diagnosed with

20        some type of medical condition that prompted him --

21   A    Yes, he went to a doctor and was on an antibiotic.

22   Q    Was he ever diagnosed with a disease or illness that

23        caused the antibiotic to be prescribed?

24   A    I actually don't know.

25   Q    And who was the doctor, if you recall?
```

1       directed me to call the college counseling office,

2       who then directed me to -- I had to call Purdue and

3       see whether his admittance was still standing or

4       not.

5  Q   When did John Winter direct you to or suggest that

6       you call Purdue?

7  A   The morning of -- no, John Winter directed me to

8       call the counseling office at Cranbrook.  And I

9       think I talked to Rencher but I can't swear on that.

10      And she directed me that I needed to -- or someone

11      needed to and it fell to me, call Purdue and see

12      whether or not his acceptance was still standing

13      because they had informed the school of the

14      disciplinary action and that it was no longer their

15      ballpark.

16  Q   All right.  So let me make sure I follow what you

17      say.  So John Winter told you to contact somebody in

18      Cranbrook's college counseling office; right?

19  A   Right.

20  Q   And you spoke to somebody in that office.  It might

21      have been Charlene Rencher but you don't recall for

22      certain who you spoke to?

23  A   Right.

24  Q   Whoever you spoke to instructed you to call Purdue?

25  A   Right.

1    Q    Did they tell you who to call at Purdue?

2    A    No.  But I asked for that director of admissions.  I

3         talked to the fellow that was running it.  I didn't

4         want to talk to just a secretary.

5    Q    All right.  So you spoke to somebody at Purdue?

6    A    A gentleman at Purdue and I believe he was the

7         director of admissions.

8    Q    Did you get his name?

9    A    No.

10   Q    Do you have any notes of your phone conversation

11        with that person?

12   A    No.

13   Q    And when did you speak to somebody in the admissions

14        office at Purdue?

15   A    I'm not positive but it would have definitely been

16        within the week of -- from the 26th of May for the

17        next -- sometime in that next seven days.

18   Q    And prior to the incident resulting in your son

19        being dismissed from Cranbrook he had already been

20        accepted to Purdue; correct?

21   A    Right.

22   Q    And so when you spoke to this person in the

23        admissions office at Purdue who you can't recall

24        their name, what do you recall telling them?

25   A    They had already -- Cranbrook had already contacted

1     that there was a disciplinary action.  And I

2     followed it up with a phone call to tell them -- to

3     ask them what his standing was.  And they wanted to

4     know what had happened.

5              And I had to go over it on the phone

6     about his accusations with this computer scandal and

7     that he was not involved.  Although I wasn't able to

8     explain to them why he was being disciplined, but

9     that he was not going to be given a diploma from

10    Cranbrook and that -- was he still able to attend

11    Purdue or not.

12  Q   And what did they say in answer to that question?

13  A   Not without a GED or a diploma.

14  Q   All right.  So during this phone conversation with

15    this person in the admission office at Purdue, you

16    gave them your explanation about the accusations

17    made against your son?

18  A   Yes.

19  Q   How long did this phone conversation last for?

20  A   Oh, probably 20 minutes, 30 minutes.

21  Q   And does your calendar that you have in front of you

22    reflect or indicate in any manner the date on which

23    you had that phone conversation with the Purdue

24    admissions office?

25  A   No, but it was within that -- right away in that

Page 30

1      in trouble.  And I wanted -- I just thought that it

2      was worth noting, I guess.

3  Q   Can I see your original calendar again for a moment,

4      please?

5  A   (Witness hands document.)

6  Q   Now, Michael was placed on probation in March of

7      2004; correct?

8  A   Correct.

9  Q   And in March of 2004 are there any notations on your

10     calendar?

11  A   No.

12  Q   And when he was placed on probation in March of 2004

13     there was a conduct review board; correct?

14  A   Correct.

15  Q   You and your husband received a letter from

16     Cranbrook in the aftermath of that advising you that

17     Michael was placed on probation; correct?

18  A   Correct.

19  Q   You would agree your calendar for March of 2004 does

20     not indicate one, that there was a conduct review

21     board hearing; or number 2, that he was placed on

22     probation; correct?

23  A   Correct.

24  Q   Do you remember if you met with Arlyce Siebert in

25     April of 2004?

| | | |
|---|---|---|
| 1 | Q | Why was that? |
| 2 | A | I'm not sure why.  I just was not involved in the |
| 3 | | application process. |
| 4 | Q | Were you involved in your son Matthew's application |
| 5 | | process for college? |
| 6 | A | Yes.  Yes. |
| 7 | Q | Now, Michael applied to some colleges that he was |
| 8 | | rejected from; correct? |
| 9 | A | I believe so. |
| 10 | Q | One of the colleges he applied to was Babson while |
| 11 | | he was attending Cranbrook; correct? |
| 12 | A | Correct. |
| 13 | Q | He was rejected by Babson? |
| 14 | A | Right. |
| 15 | Q | Do you know why he was rejected by Babson? |
| 16 | A | No. |
| 17 | Q | Do you know why Michael was rejected by any college |
| 18 | | that rejected him? |
| 19 | A | No. |
| 20 | Q | So I want to come back to these meetings that you |
| 21 | | had with Arlyce Siebert about your son Michael.  Do |
| 22 | | you recall attending such meetings before the |
| 23 | | meeting that you attended with your husband in May |
| 24 | | of 2004; correct? |
| 25 | A | Correct. |

Page 48

1   Q   Do you remember, was that before or after he was

2       placed on probation?

3   A   That was -- I had the meeting to inform me that this

4       had happened, that he had found a pipe in Michael's

5       book bag.  And that there would be a CRB and that

6       that -- the follow up on that was the probation.

7   Q   Okay.  So John Winter advised you that someone had

8       found in Michael's book bag a pipe?

9   A   When Michael arrived at his 8 a.m. class, Winter had

10      been waiting outside the classroom for Michael to

11      arrive.

12  Q   I'm going to have to interrupt you.  And again, you

13      know, I'm going to chalk this up to your

14      unfamiliarity with the process.

15                  My question was simply:  Did somebody

16      advise you that the pipe was found in Michael's book

17      bag?  So that's a yes or no.

18  A   Did someone advise me that the pipe was --

19  Q   -- was found in Michael's book bag?

20  A   Yes.

21  Q   Who advised you of that, Mrs. Dupree?

22  A   Winter.

23  Q   And how did he advise you of that?  Was that in

24      person?  Telephone?  What was the method of

25      communication?

1   A   He telephoned and asked me to come up to the school.

2   Q   Do you remember the date?

3   A   No.

4   Q   And you would agree your calendar does not reflect

5       that?

6   A   No.

7   Q   And so did you go out the same day to the school

8       that he telephoned you?

9   A   Yes.

10   Q   And then you met with Mr. Winter on that day?

11   A   Yes.

12   Q   Was anybody else present during that meeting?

13   A   Michael.

14   Q   And was Michael present throughout the meeting?

15   A   No.  Michael and I got into an argument during the

16       meeting and Michael got up and left and then Winter

17       stood up and screamed out, he's out.

18   Q   How soon into the meeting did you and your son get

19       into an argument?

20   A   Pretty soon.  I was very upset.  Winter told us this

21       and then I turned to Michael and said, How could you

22       do this?  You know the rules.  And then Michael got

23       up and left.

24   Q   And did the meeting with Winter continue?

25   A   He stood up and said, He's out.  And then the

1    book bag and Winter explained to you what your son

2    gave him was this drug paraphernalia; correct?

3  A   So-called drug paraphernalia.  It was a pipe.

4  Q   Well, did you ever see the pipe?

5  A   I saw the pipe.

6  Q   How did you happen to see the pipe?

7  A   Winter had it in his hands, showed it to me.

8  Q   And you weren't familiar with it?

9  A   No.

10  Q   And did he show it to you in the presence of your

11    son?

12  A   Yes.

13  Q   And so during the course of this meeting,

14    Mrs. Dupree, was Mr. Winter letting you know that

15    your son was being accused of violating the school's

16    code of conduct?

17  A   Yes.

18  Q   And did he also let you know in that meeting that

19    there was going to be a conduct review board

20    hearing?

21  A   Yes.

22  Q   Did he let you know that before or after your son

23    walked out?

24  A   After.

25  Q   And there was a conduct review board meeting that

1   Q   Okay.  Now, you indicated an acknowledgment that you

2        did not sign the enrollment agreement for Michael

3        for the school year 2003-2004?

4   A   I -- no, I didn't.  It's not there.  My signature is

5        not there.

6   Q   Have you ever seen that document before today?

7   A   Yes.

8   Q   When's the first time you saw it?

9   A   Oh, I guess when they were entering sixth and ninth,

10       so that would have been ten years ago.

11   Q   So when your sons originally enrolled at Cranbrook

12       was the first time you saw that type of document?

13   A   Right.

14   Q   And were you aware that the enrollment agreement

15       provided that Cranbrook dismissed your children at

16       any time if they violated any of the conduct code at

17       Cranbrook?

18   A   Yes.

19   Q   And with regard to Exhibit 3, which is from your

20       husband's deposition, which is the March 12, 2004

21       probation letter, did you see that letter around the

22       time that it was sent to you and your husband?

23   A   Yes.

24   Q   And after you got that letter did you contact

25       anybody at Cranbrook?

1     once?

2  A  No, no.

3  Q  When you sat in on your husband's deposition on

4     Tuesday, do you recall some testimony about the fact

5     that supposedly Cranbrook was trying to accuse your

6     son of being involved with selling drugs and

7     marijuana?

8  A  Yes.

9  Q  And there was some testimony about a student by the

10    name of Ali, do you remember?

11  A  Ali, yeah.

12  Q  Do you know who Ali is?

13  A  I knew, yes.

14  Q  Do you know what his last name is?

15  A  I think it's Mahmood.

16  Q  Now, were you aware that your son Michael had a

17    business called ultrapresence.net?

18  A  Yes.

19  Q  What did you know about his business?

20  A  Nothing.  I don't understand computers at all.

21  Q  At any time when you met with anybody from Cranbrook

22    about Michael's being dismissed from school did they

23    ever threaten you with criminal prosecution?

24  A  No.

25  Q  Did they ever threaten Michael with criminal

1   A    When we met about his academic progress earlier in

2        the year, I can't remember when, but when the

3        meeting I referred to where Winter, Rutzen, Arlyce,

4        my husband, and I were at and talked about his

5        academic progress, Arlyce turned to Debbie Rutzen

6        and said, What does he need to graduate?

7                      And she said English.  I took the

8        English written exam over and had it signed that it

9        was submitted.  So therefore, if he completed the

10       requirement for English, he would have completed the

11       requirements for graduation.

12  Q    Now, this meeting that you just described for us,

13       was that before or after Michael was placed on

14       probation in March of 2004?

15  A    Before, I believe.

16  Q    Now, let's look again at paragraph 15.  There's

17       reference to the community education -- the

18       Cranbrook Educational Community handbook.  Do you

19       see that in paragraph 15?

20  A    Yes.

21  Q    Would that be the handbook for school year

22       2003-2004?

23  A    I don't know.

24  Q    Okay.  All right.  Let's go to paragraph 16.  Why

25       don't you read that to yourself.  And when you're

```
 1        done with that, I'll have a question or two
 2        regarding it.
 3   A    (Witness reviewing document.)  I've read it.
 4   Q    Okay.  So this indicates that you're claiming, among
 5        other things, that the dismissal that you were
 6        advised of in the letter dated June 1, 2004 was null
 7        and void because you felt that he had completed all
 8        of the requirements to graduate; correct?
 9   A    Yes.
10   Q    And you indicated that your understanding as to his
11        completion of those requirements was based on the
12        meeting you had before he was placed on probation
13        with Arlyce Siebert, John Winter, and Ms. Rutzen;
14        correct?
15   A    Yes.  As well as the transcript that reflects that
16        he completed his final term and received final
17        grades.
18   Q    All right.  So let's talk about the transcript for a
19        moment.  I just want to make sure I fully understand
20        your claim.
21                      So the transcript, I'm going to show
22        you what was previously marked as Exhibit 6 at your
23        husband's deposition.  First of all, I'm going to
24        ask you if you've seen that transcript before.
25   A    Yes.
```

Page 68

1   Q   So as I now understand your testimony, your belief

2       that Michael had completed his requirements to

3       graduate as of June 1, 2004 are based on A, the

4       meeting you described for us that took place before

5       he was placed on probation; correct?

6   A   Yes.

7   Q   And B, the transcript which you have in your hand,

8       Exhibit 6?

9   A   Let me clarify.  I knew at the time when I took the

10      English exam over to be signed that he was then

11      completing all requirements.  When I got the

12      transcript, that was verified.

13  Q   All right.  When you say you knew at the time you

14      took the English exam over that he had completed his

15      requirements, when was that?

16  A   The 27th.

17  Q   Of May?

18  A   Um-hmm.

19  Q   That's a "yes"?

20  A   Yes.

21  Q   Thank you.

22  A   Sorry, sorry.

23  Q   That's okay.  So May 27th, 2004.  You knew, though,

24      according to the terms of his probation that he was

25      on probation through June 4th of 2004; correct?

Page 70

1         meeting you had with Arlyce Seibert?

2    A    Yes.

3    Q    Okay.  This meeting's reflected in the notes that

4         you provided today; correct?

5    A    Right.

6    Q    Okay.  Let's go to paragraph 20 of the Complaint.

7         And again, read it to yourself and I'll have a

8         question or two regarding that paragraph.

9    A    (Witness reviewing document.)  Yes.  I've read it.

10   Q    All right.  So that paragraph alleges, among other

11        things, that Cranbrook threatened you and your son

12        with federal prosecution; correct?

13   A    Yes.

14   Q    And you testified a moment ago, you and your husband

15        were never threatened with prosecution; correct?

16   A    Correct.

17   Q    Let's go to paragraph 22 on Page 5.  And again, I'm

18        going to ask you to read it to yourself and I'll

19        have a question or two regarding that paragraph.

20   A    (Witness reviewing document.)  Read.

21   Q    Okay.  So that paragraph alleges that:

22                   "Cranbrook, through its agents

23                and or employees, coerced and or

24                pleaded with a fellow student to

25                state and testify that Michael Dupree

1    you know that for a fact?

2   A   Yes.

3   Q   Were you a participant in that phone conversation?

4   A   I was probably standing nearby in the kitchen.  We

5    were in the kitchen.

6   Q   Do you recall ever signing any documents authorizing

7    the release of your son Michael's academic records?

8   A   No.  Well, you mean ever?  Yes, sometime, yes.

9   Q   And do you recall ever signing such a document while

10    he was enrolled at Cranbrook?

11   A   I know when we did the college process that one of

12    us or both of us signed to allow the transcript to

13    be sent.  But that was prior to the "W" being put on

14    them.

15   Q   Okay.  Do you recall that that form allowed you to

16    revoke your authorization?

17   A   I don't even understand what you just asked me.

18    What do you mean, revoke my authorization?

19   Q   Well, here, I'm going to help you out.

20              MR. LINDEN:  Let's mark this

21    Exhibit 4.

22               (Deposition Exhibit Number 4 was

23               marked for identification.)

24  BY MR. LINDEN:

25   Q   You've just been handed what has been marked

```
 1        Exhibit 4.
 2   A    Okay.
 3   Q    Let me note for the record for purposes of
 4        identification, it's a form entitled permission to
 5        release school records form.  After you've reviewed
 6        this document, let me know and I'll have some
 7        questions for you, Mrs. Dupree.
 8   A    Okay.
 9   Q    Have you seen this document before?
10   A    Yes.
11   Q    Is that your signature?
12   A    Yes.
13   Q    Okay.  And you signed this, apparently, on June 1,
14        2003; correct?
15   A    Yes.
16   Q    And do you see in the first paragraph, the last
17        sentence says:
18                        "This authorization shall remain
19                   in force until specifically revoked
20                   by me in writing."
21                        Do you see that?
22   A    Yes.
23   Q    Did you ever revoke this document?
24   A    No.
25   Q    Let's go to what would be the fourth to the last
```

Page 84

1    Q    Okay.  So in this paragraph it alleges that you

2         relied upon some false representations including

3         that if Michael completed his credits, schoolwork,

4         and graduation requirements from Cranbrook, that he

5         would be entitled to his high school diploma;

6         correct?

7    A    Correct.

8    Q    Who made those representations?

9    A    Arlyce.

10   Q    And when did Arlyce make those representations?

11   A    When we'd had the meeting about his academic

12        progress.  We were all like going over all these

13        classes and everything.  And then she said to

14        Debbie, What does he need to graduate?  And then

15        Debbie Rutzen started going into a long thing.

16                     Arlyce said no, no, just tell me,

17        what does he need to graduate and she said English.

18   Q    Again, this is the meeting that took place before he

19        was placed on probation in March of 2004?

20   A    Correct.

21   Q    Okay.  With regard to the colleges that Michael

22        applied to, did any of them not accept GEDs?

23   A    I really wasn't involved in the application process.

24   Q    So you wouldn't know that?

25   A    I don't know.

1   Q   Has he discussed with you what his postgraduate

2       plans might be?

3   A   No.

4   Q   As I understand it, one of the things you're

5       claiming in this lawsuit, that Cranbrook falsified

6       the transcript?

7   A   Yes.

8   Q   How did they falsify the transcript?

9   A   He did not withdraw and they put that on a legal

10      transcript with a seal.

11   Q   And according to your Complaint, Charles Shaw

12      explained to your husband that a reason they did

13      this was because they thought it would be better for

14      your son; correct?

15   A   I believe his words were, we're doing you a favor.

16   Q   And he was saying that because alternatively they

17      would have indicated that he had been dismissed from

18      school; correct?

19   A   Correct.

20   Q   Do you have any idea of whether or not having a

21      transcript indicating that he was dismissed from

22      school would have impaired Michael's abilities to

23      get into any colleges?

24   A   No more so than getting a GED under any situation.

25   Q   So your testimony would be that getting a GED is no

Page 101

1        day of school at the beginning of the year in

2        September of 2003.  So he was not on probation at

3        the time.  So it was irrelevant.

4   Q   All right.  So you don't dispute, among other

5        things, that at some point Michael, your son, gave

6        another student his password?

7   A   No dispute.

8   Q   Okay.  And by the way, have you had a chance to

9        review any of the documents that Cranbrook's

10       produced in this case?

11  A   No.

12  Q   So that would mean, for example, you've had no

13       chance to review the investigation that the school

14       did regarding the allegations involving Michael's

15       violation of the computer use technology policy;

16       correct?

17  A   Correct.

18                 MR. LINDEN:  Let's take a break for a

19       second.

20                 (Short recess taken at 1:30

21                 p.m.)

22                 (Back on the record at 1:44

23                 p.m.)

24  BY MR. LINDEN:

25  Q   I want to make sure I understand the testimony that

1       small community and if everybody's going to be

2       chatting, then it's very difficult for the people to

3       stay on there.

4   Q   Okay.  Let's turn to what would be Page 4 of this

5       Exhibit.  So these are notes of Friday a.m.  So

6       would this be Friday, May 28, 2004?

7   A   Yes.

8   Q   Why don't you read to us what these notes say?

9   A   Michael e-mailed stat, which is his stat exam.  It

10      was a take-home exam.  He e-mailed that in.  Winter

11      called to tell me that CRB had recommended

12      dismissal.  Michael was forbidden on campus at all.

13      He would receive all his credits and I could talk to

14      college counseling.  They had been investigating a

15      GED for other students.

16                  And Winter called back and spoke with

17      Michael and said basically -- I have written same

18      thing, meaning he said the same thing to Michael,

19      that you cannot come on campus and that you are --

20      have been recommended for dismissal.

21  Q   Okay.  And when were these notes -- when were they

22      prepared?

23  A   Probably Friday evening.

24  Q   And Friday evening, May 28th of 2004?

25  A   I probably sat down after we had all the meetings

```
 1           Friday and wrote it Friday night.
 2    Q      All right.  Now, let's go back to your calendar, at
 3           least the portion from May 2004 which is Exhibit 1.
 4           There's a notation May 26, 1:30, called, suspended.
 5           Do you see that?
 6    A      1:30 call from Michael.  And at that meeting that I
 7           met with Dean Winter he said he was suspended.
 8    Q      So you were notified on May 26th that he had been
 9           suspended; correct?
10    A      Correct.  Verbally by Dean Winter.
11    Q      Okay.  And was it your understanding he was
12           suspended pending conducting the conduct review
13           board hearing?
14    A      No.  Pending the -- while they went -- I guess they
15           suspended people that were involved with the
16           computer scandal in order to give them time to
17           determine what went on or something.
18    Q      All right.  But you were notified on May 26 that he
19           had been suspended?
20    A      Correct.
21    Q      And it related to this -- these allegations
22           involving the computer?
23    A      Right.
24    Q      And you would agree as of May 26th, according to
25           your version of things, Michael had not completed
```

1        the requirements to graduate?

2    A   Yes.

3    Q   Okay.  Let's go to the next page, Page 5.

4    A   (Witness complies.)

5    Q   So this is Friday.  So this still is May 28th, 2004?

6    A   Same day, yeah.

7    Q   Okay.  If you would, why don't you read these for us

8        as well, please.

9    A   Okay.  Friday a.m. we went in, meaning to Arlyce's

10       office, Arlyce Seibert's office at 10 o'clock

11       without Michael for 45 minutes.  That's approximate.

12       She said regarding the IT.  She was -- well, how she

13       said it was she was convinced she was -- felt the

14       information convincing that he was involved.

15                    She felt that the information that

16       she had received was convincing that he was involved

17       and that was given her.  And we should have Winter,

18       Pickett, Shaw present that.  Okay.  She did not have

19       any of the proof that he was involved is what she

20       was telling us.

21   Q   The "she" we're referring to would be Arlyce

22       Seibert?

23   A   Arlyce Seibert said she -- Mike asked her for the

24       proof that he was involved.  She said she did not

25       have the proof but she felt that the proof was

Page 116

1    A    That night.

2    Q    Okay.  And let's talk very briefly about Matthew's

3         experience at Cranbrook.  How would you characterize

4         his experience at Cranbrook?

5    A    Fine.

6    Q    And he obviously was enrolled there in academic year

7         2004-2005, 2005-2006, and then when he graduated in

8         2006-2007; correct?

9    A    Yes.  From six through 12 he was at Cranbrook.

10                       MR. LINDEN:  Give me a minute.  I

11        think we're just about done.

12                       (Short recess taken at 2:02

13                       p.m.)

14                       (Back on the record at 2:19

15                       p.m.)

16   BY MR. LINDEN:

17   Q    Just I think a few follow-up questions.  Then we

18        should be done.  So Exhibit 5, your notes, did

19        someone ask you to prepare these notes?

20   A    No.

21   Q    And I'd like you to turn to Page 4 of the notes,

22        which the top of it should indicate Friday a.m. and

23        we established before, this was Friday, May 28th,

24        2004; correct?

25   A    Um-hmm.

1   Q   That's a "yes"?

2   A   Yes.  I'm sorry.

3   Q   Thank you.  So the first sentence you have, Michael

4       e-mailed stat.  And I believe you indicated before

5       that was his statistics exam?

6   A   Well, he was in this group -- they didn't do an

7       exam.  They just did a project or something.  I

8       don't exactly know what it was.  But I just made a

9       note of it because I wanted to be sure that

10      everything that he thought he did was -- I think

11      what they did was they had to submit their stuff

12      during the time that they -- the class was or

13      something.  He didn't actually turn it in because he

14      was -- it was a group of six, I think.  And

15      something --

16  Q   But it was a group project required by that class?

17  A   Yes.

18  Q   And he was turning it in via e-mail on May 28th;

19      correct?

20  A   Right, right.  I believe, yes.

21  Q   And it's something he needed to do to complete the

22      course?

23  A   Yes.

24  Q   And then it indicates, I could talk to college

25      counseling.  They had been investigating a GED for