# JOHN WINTER
# DEPOSITION TRANSCRIPT

STATE OF MICHIGAN
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

MICHAEL DUPREE, JR., a Colorado Resident,
MICHAEL DUPREE, SR. and DARLENE DUPREE,
his parents, Residents of the Country of Austria,

Plaintiffs:

-vs-                    Case No. 2010-CV-120940-LPZ-MKM
                        Hon. Laurence Zatkoff
                        Mag. Mona K. Majzoub
CRANBROOK EDUCATIONAL
COMMUNITY, JOHN J. WINTER and
CHARLES SHAW,

Defendants:
_____/

The deposition of JOHN WINTER, taken before

Lisa M. Fix, a Certified Shorthand Reporter and Notary

Public for the County of Wayne, State of Michigan, at

38500 Woodward, Suite 100, Bloomfield Hills, Michigan,

on Thursday, the 13th Day of January, 2011, at 2:55

p.m.

APPEARANCES:

                    THOMAS, GARVEY, GARVEY & SCIOTTI
                    ATTORNEYS AT LAW
                    24825 Little Mack
                    St. Clair Shores, Michigan  40808
                    By:  CHRISTOPHER SCIOTTI, ESQ.
                    Appearing on behalf of the Plaintiff:

                    HONIGMAN, MILLER, SCHWARTZ & COHN
                    ATTORNEYS AT LAW
                    660 Woodward, Suite 2290
                    Detroit, Michigan  48226
                    By:  RUSSELL S. LINDEN, ESQ.
                    Appearing on behalf of the Defendant:

1   A   My bachelor's, I acquired that from Western

2       Michigan University.

3   Q   What?

4   A   Bachelor's degree.

5   Q   From what university?

6   A   From Western Michigan University --

7   Q   Okay.

8   A   -- in 1973.  I acquired my master's in secondary

9       education from Wayne State University I think in

10      1982.

11  Q   And then can you give me an idea of your

12      employment history with Cranbrook?

13  A   I hired in there in the fall of 1983 as a middle

14      school science teacher.  I then after three years

15      moved to the upper school, gained residence as a

16      house advisor as a science teacher.  Becoming Dean

17      of the boys six years later, so that would have

18      been -- I'm trying to think of the year, doing the

19      math in my head.  It's hard for me to do this

20      math.  I need a pencil.  This is terrible.

21  Q   Well --

22  A   I was dean for 17 years.  I'm currently working as

23      the director of alumni relations.

24  Q   Okay.  So suffice it to say, you were dean during

25      2000 -- 2001 through 2003, 2004?

1  A   Yes, that's correct.

2  Q   And then what's your capacity now?

3  A   I work as the director of alumni relations.

4  Q   And when did you --

5  A   July of 2010.

6  Q   So you can help us explain why Michael Dupree got

7      this alumni letter?

8  A   When was the letter sent?

9  Q   2009.

10 A   This was before I became.

11 Q   Before?

12 A   Yeah.

13 Q   Okay.

14 A   July of 2010.

15 Q   Why did you move from Dean of boys to director of

16     alumni relations?

17 A   There was a retirement in that office, and I found

18     that line of work to be interesting, and so it was

19     one of those moves career-wise that worked --

20 Q   Okay.

21 A   -- for me.

22 Q   I mean is it -- did you do that voluntarily?

23 A   Oh, yeah.

24 Q   Okay.

25 A   Oh, yeah.

| | | |
|---|---|---|
| 1 | Q | Okay. |
| 2 | A | So. |
| 3 | Q | And how do you know that? |
| 4 | A | Reports from public safety would come in. |
| 5 | Q | Okay. |
| 6 | A | We have public safety on the campus. |
| 7 | Q | And how would you describe his personality? |
| 8 | A | Friendly, I would say. |
| 9 | Q | Throughout his entire stay? |
| 10 | A | Yeah.  Yeah.  I would not say otherwise. |
| 11 | Q | Okay.  How would you describe her relationship |
| 12 | | with Michael Dupree, Jr. over the years that he |
| 13 | | was there? |
| 14 | A | I think it's as -- I think quite normal, ordinary. |
| 15 | | You know, as far as a student and a dean's |
| 16 | | relationship.  It was one of respect I would |
| 17 | | characterize it. |
| 18 | Q | Okay.  Now, did that change after March of 2004? |
| 19 | A | When -- no, I wouldn't say so unless it changed |
| 20 | | for Michael.  I can't speak, you know, about his |
| 21 | | perception, but certainly from my perception, no. |
| 22 | Q | Tell me what happened in March of 2004. |
| 23 | A | Michael, I went to the math office to speak to him |
| 24 | | about an issue, I believe it was attendance, could |
| 25 | | have been excessive tardiness, and as he came to |

```
 1          my office I had said bring your book bag.  So as

 2          he was in my office he was quite nervous, I said

 3          Mike, what's wrong?  And we're just talking, you

 4          know, about some mundane issues, and I could smell

 5          smoke, you know, residue is a smoke, whatever it

 6          was, and I said is there anything in your book

 7          bag, because it was very obvious that he was

 8          nervous.  And so the book bag revealed a pipe.

 9   Q      Okay.  Now, did you tell him to bring his book bag

10          to the office?

11   A      Uh-huh.  Yes.

12   Q      Okay.  Now, did you review Michael Dupree, Jr.'s

13          deposition?

14   A      I did.  I did, yeah.

15   Q      Okay.  He testified that you came to the math

16          room --

17   A      Uh-huh.

18   Q      -- and saw his book bag laying in the hallway.  Is

19          that what you remember?

20   A      I know the book bag was in the hallway, yes.

21   Q      Okay.

22   A      Yes.

23   Q      So you told him come to the office and bring your

24          book bag?

25   A      Yeah.  Well, yeah, because the book bags in the
```

```
 1        hallway are not typical.
 2   Q    Okay.
 3   A    The kids don't leave their book bags there.
 4   Q    Okay.  And then did he give you the book bag and
 5        you looked through it?
 6   A    I don't recall the sequence.  I know that I did
 7        ask him if there was something in there that would
 8        cause a problem.  I don't really search the bags
 9        myself, I have the kids go through it.
10   Q    Okay.
11   A    And reveal, unzip and all that.
12   Q    And he pulled out a pipe?
13   A    There was a pipe in the bag, yeah.
14   Q    And what did the pipe look like?
15   A    As I recall, it was a glass pipe.  I don't
16        remember the color.  To me it was a marijuana
17        pipe.
18   Q    Okay.
19   A    A drug paraphernalia type.
20   Q    So what did you do about that?
21   A    That violates the possession of having a drug
22        paraphernalia, violates our school standards, so I
23        explained to Mike that this was a rule violation
24        and that we had to take, you know, some steps
25        here, and that would lead to some discipline
```

1    A    Yes.

2    Q    And when you talked to his mother Darlene, tell me

3         the nature of that conversation.

4    A    She came over to the school and, you know, I said

5         Mrs. Dupree, you know, we have a concern here with

6         this, you know, having this pipe.  And Mike was

7         quite upset, you know, and he ended up leaving the

8         room, as I recall.  But that's kind of where the

9         conversation went.  I explained to Mrs. Dupree

10        that we have to initiate a Conduct Review Board

11        over this procedure, because having that in his

12        possession violated our school rule.

13   Q    And why do you think Michael -- I take it he like

14        abruptly left the meeting?

15   A    My recollection is that he left, yes.

16   Q    And why?  Do you know why?

17   A    I think he was upset.  I don't know, you know,

18        sometimes kids get afraid.  I don't know whether

19        he was out of fear or anger, I'm not sure, but he

20        did leave.

21   Q    And what was your demeanor during that meeting

22        with Mrs. Dupree?

23   A    My demeanor is one of just explaining to the

24        family what had occurred.  I recall that, you

25        know, emotions were high, but not -- not anything

Page 15

1        that was negative in any way that I recall.

2  Q    Okay.  Now, did you at that meeting, before the

3        Conduct Review Board, did you indicate to

4        Mrs. Dupree what could happen to Michael?

5  A    Generally the procedure that you follow, or that I

6        follow is to explain to the family what can

7        happen.  In this case, this was Michael's first

8        offense in terms of a rule violation, so that

9        conduct has to be reviewed by the Conduct Review

10       Board, outcomes which are determined by

11       recommendations by that board to the head of the

12       upper school.

13  Q   And was there a Conduct Review Board held?

14  A   Yes, there was.  Yes.

15  Q   Okay.  And you can look at Exhibit 1.

16  A   Yes.

17  Q   We've established those are notes by Sharon

18       Peacock.

19  A   Yes.  Yes.

20  Q   Are there any other notes?

21  A   No, sir.

22  Q   Okay.  And you were -- you attended that?

23  A   Yes.

24  Q   And do you remember what other students attended?

25  A   I do not recall the students.

Page 16

1   Q   Okay.  Can you -- did you review this?

2   A   Yeah, I mean -- yes.

3   Q   Okay.  Is there anything in these notes that you

4       disagree with?

5   A   There's much in here that I don't recall.

6   Q   Okay.

7   A   I don't know that I disagree with it, but I just

8       don't recall.

9   Q   Okay.  As we go through this, I just want to ask

10      you some things about this.  "The marijuana pipe

11      belonged to a friend, when pipe given to Mike last

12      night, believe it had been smoked."  What's the

13      significance of that to you?

14  A   This would be her notes with comments that were

15      made.  So the significance to me is that Michael

16      is indicating that the pipe belonged to someone

17      else.

18  Q   So and what does that mean to you?

19  A   To me personally, and to the school it doesn't

20      mean any difference.  Possession of a drug

21      paraphernalia is not -- is against our school

22      rules.

23  Q   Okay.  And what does that "Friend gave" something

24      "not anymore."  Do you know what that says?

25  A   I --

1    Q    I don't know either.

2    A    Cig.  I can't make it out.

3    Q    What does CW-1 mean?

4    A    Where are you seeing that?

5    Q    A few lines down.

6    A    Oh, that refers to conduct warning level one.

7    Q    It's what?

8    A    Conduct warning level one.

9    Q    What does that mean?

10   A    It's a form of reaction to a student's behavior

11        that we employ in the school.

12   Q    And what's the significance of that conduct?

13   A    It's intended, warning.

14   Q    Okay.

15   A    Your conduct is not considered appropriate, and

16        therefore we give you a warning so that you think

17        about things without repeating that behavior.

18   Q    Okay.  Did you consider that pipe drug

19        paraphernalia?

20   A    Yes, I did.

21   Q    What, because of the configuration of it?

22   A    Um, well, yeah, that's one thing.  There was what

23        I thought was some kind of residue in the bowl of

24        the pipe.

25   Q    You know, you would have found like the classic

1        pipe, tobacco pipe would that have been considered

2        drug paraphernalia?

3  A    Cigarettes are against school rules, as well.  So

4        any tobacco product, or even tobacco look-alike

5        product is considered in that realm.

6  Q    And he would have had a Conduct Review Board for

7        that?

8  A    Uh-huh.

9  Q    That's yes?

10  A    Yes.  I'm sorry.

11  Q    Down at the bottom there's a blacked out square.

12  A    Uh-huh.

13  Q    Do you know what that is, no to something, the

14        prom --

15  A    Yeah, it might be initials of someone in

16        attendance at the -- that's blacked out there, I'm

17        not sure.

18  Q    Okay.

19  A    No to --

20  Q    What did you --

21  A    As --

22  Q    Go ahead.

23  A    No, I don't know if it says prom or not.  I can't

24        read this.

25  Q    Did you have prior knowledge that he had the pipe?

1   A   No, I did not.

2   Q   So after what did you -- what did you do after the

3       hearing?

4   A   After the committee concluded, there are a series

5       of recommendations that are shared with the head

6       of the upper school.  So I would have met with

7       Charlie Shaw.

8   Q   Okay.  You, or you and Sharon Peacock, or you and

9       Eric Linder?

10  A   No, no, it would be the two deans.  Sometimes not

11      both of us, but generally both of us do go to his

12      office when we're finished.

13  Q   And in this case?

14  A   I can't recall whether it was both of us or one of

15      us.

16  Q   Okay.  And so what did you recommend?

17  A   The recommendation at that time was that Michael

18      be placed on what we call conduct probation until

19      June 4th, 2004.  He was suspended from school for

20      I believe it was three days, and that we advised

21      the family that they should engage in some kind of

22      substance evaluation, education program.

23  Q   And did they comply?

24  A   To my knowledge, yes.

25  Q   So he remained away from school and did the

```
 1        assessment?

 2   A    Uh-huh.

 3   Q    Is that a yes?

 4   A    To my knowledge, yes.

 5   Q    Okay.

 6   A    Yes.

 7   Q    And this was sent to James Pickett and Del Walden.

 8        Who are they?

 9   A    Which?

10   Q    I'm looking at Exhibit 2.

11   A    Del Walden was one of our school counselors at the

12        time.

13   Q    Uh-huh.

14   A    And James Pickett at that time was Dean of

15        faculty.

16   Q    Okay.  And then from that day, May or -- or March

17        12th, 2004 until May 27th.

18   A    Uh-huh.

19   Q    Which we've kind of established was the next

20        Conduct Review Board.

21   A    Date, yes.

22   Q    Did you have any significant interactions with

23        Michael, Jr?

24   A    None that were significant that I recall.  There

25        might have been more attendance issues, but
```

| 1 | A | I don't remember that. |
| 2 | Q | Do you remember a Mr. Murphy calling and |
| 3 | | complaining about Michael's driving? |
| 4 | A | No, I don't.  There's a Mr. Murphy faculty member, |
| 5 | | but I don't remember him ever saying anything |
| 6 | | about driving. |
| 7 | Q | Okay.  So is it your testimony that until -- from |
| 8 | | March 12th of 2004 through let's say May 25th, |
| 9 | | 2004 that Michael's attendance at Cranbrook was |
| 10 | | relatively uneventful? |
| 11 | A | I don't recollect otherwise, so yes. |
| 12 | Q | Okay.  Then what is the next thing that you |
| 13 | | remember that was eventful? |
| 14 | A | The notification that I had been given that there |
| 15 | | was a password violation. |
| 16 | Q | Okay.  And was it your understanding that that |
| 17 | | password violation occurred in September of '03? |
| 18 | A | The timing of the event was not as important.  I |
| 19 | | don't even know if I was given the time frame of |
| 20 | | that event at the time, it was just that his |
| 21 | | password had been given to another student. |
| 22 | Q | Okay.  And how did you learn that? |
| 23 | A | I believe it was through Tom DeCraene. |
| 24 | Q | And who's Tom DeCraene? |
| 25 | A | He is the coordinator of information technology |

Page 25

1        for the schools.

2    Q   And where's -- if you were to look at Exhibit 7,

3        that's a memo from Cranbrook IT, basically?

4    A   Yep.

5    Q   And who's Doug Ebert?

6    A   Doug I believe was the chief financial officer of

7        the school.

8    Q   And Jim Pickett?

9    A   Dean of faculty.

10   Q   And Scott Looney?

11   A   Again, I'm not sure the timing.  Scott Looney held

12       different positions at the school.  He could have

13       been in admissions at that time.

14   Q   And Tom DeCraene?

15   A   Our school's information technology person.

16   Q   Okay.  And this memo wasn't addressed to you, but

17       you became aware of it?

18   A   I wasn't aware of this until much later.  I did

19       not see this.

20   Q   Well, the Conduct Review Board was on May 27th.

21   A   Right.

22   Q   So only two days later.

23   A   Right.  I don't think I ever saw this.  I don't

24       recall seeing this.  All I know is that he had

25       been -- I was told that he had given his password

Page 26

```
 1       out.
 2   Q   Okay.  So is it fair to say you actually didn't
 3       see Exhibit 7 until after this whole dismissal?
 4   A   That's my recollection.
 5   Q   Okay.  And what did Tom DeCraene tell you?
 6   A   That there was a problem, that a password had been
 7       given out, a program that allowed the capture of
 8       other ID's, passwords on computer existed.  We had
 9       a student, two students involved in this.
10   Q   And that was Randy Bruder?
11   A   That's correct.
12   Q   Tell me what you did as far as Randy -- Randy
13       Bruder was a junior; isn't that correct?
14   A   Yes, I believe so, that's correct.
15   Q   And what did you do as far as Randy Bruder was
16       concerned?
17   A   Again, you ask the questions, you know, what
18       happened.  We understand there's some problems
19       here with you having access to test files.  He
20       admitted it, called the family, told the family
21       this is very serious, you know, Conduct Review
22       Board, or you have the opportunity to withdraw
23       from the school, and they chose to withdraw.
24   Q   Okay.  And then as far as -- so you talked to him?
25   A   Yes, sir.
```

1    Q    Randy?

2    A    Yep.

3    Q    Did you talk to him first before Michael?

4    A    I can't recall the sequence.  I believe so.

5    Q    Okay.  Did Randy Bruder tell you that other than

6         giving Randy Michael's password, that Michael had

7         no other conduct regarding this?

8    A    My recollection is that he tried to own the

9         behavior himself as most students do, but

10        nonetheless, whether or not the program was

11        shifted, it's the password, giving away the

12        password what was examined.

13   Q    Okay.  Is that, as far as -- as far as Michael

14        Dupree, Jr. is concerned, was that, in your mind,

15        his major violation, giving that password away?

16   A    That's correct.  Yes.

17   Q    In September of '03?

18   A    During the school year, yes.  Yes.

19   Q    And to you it didn't matter whether it was before

20        March or after March --

21   A    No.

22   Q    -- giving the password?

23   A    The sequencing didn't come into play.

24   Q    And it appears from Exhibit 6 down in that --

25        Exhibit 6 is Sharon Peacock notes of the May

Page 29

1  Q    What I'm asking you is, Michael has admitted that

2       he gave Randy the password --

3  A    That is correct.

4  Q    -- in the early school year, and he's admitted

5       that.  And my question is, when you talked to

6       Randy Bruder, did Randy admit to all the other

7       violations?

8  A    He admitted to having this program that would

9       capture passwords and allowed him to log in as a

10      teacher to acquire tests, that's what Randy's

11      admission was.

12 Q    And you were present at the Conduct Review Board

13      on May 27th?

14 A    Yes, sir.

15 Q    And you can refer to those notes now?

16 A    Okay.

17 Q    Who was -- who was Michael, Jr.'s advocate?

18 A    Eric Lorey, teacher at the school.

19 Q    And how did it happen that it was Eric Lorey?

20 A    Michael's advocate would have been the director of

21      schools, Arlyce Seibert.  Arlyce Seibert couldn't

22      be in that position because Michael was already on

23      probation, second offense.  While you're on

24      probation could lead to an outcome of dismissal.

25      Appeals process involves Arlyce in that dismissal

1    you know, I would consider one of the tough ones

2    because the stakes for the outcome is

3    extraordinary here.  Student on probation, already

4    been suspended, and now up again for a major

5    school rule violation.  Those are difficult

6    meetings that you conduct with students.

7  Q  Do you remember what did Michael admit to?

8  A  He admitted that he had given his password out.

9  Q  Okay.  And when you -- after this -- did he admit

10   to anything else?

11 A  Not to my recollection.  It was the password

12   violation was the one that was the major school

13   rule violation at the time.

14 Q  Okay.  Do you remember speaking about this matter

15   with Sharon Peacock and Charlie Shaw?

16 A  We would -- you mean when the meeting concluded?

17 Q  Yes.

18 A  The next step is to take a recommendation forward

19   to Charlie Shaw.

20 Q  Okay.

21 A  So I would have done that, yes.

22 Q  Michael testified that when Doctor Lorey attempted

23   to speak that he was told he couldn't speak on

24   Michael's behalf.  Do you remember that?

25 A  Advisors speak on the behalf of the students at a

Page 34

```
 1         certain point of the meeting.  I don't remember
 2         that exact statement, but they speak at the end of
 3         the meeting as we start our conclusion.  So I
 4         don't know if Doctor Lorey spoke earlier or not.
 5         I don't recall anyone telling him to, you know, be
 6         quiet or not to speak, because the advisor
 7         advocate is given that time at the end of the
 8         meeting.
 9    Q    And do you remember him speaking?
10    A    At the end of the meeting?
11    Q    Yes.
12    A    He would have had that opportunity, yes.
13    Q    Do you have an independent memory of that?
14    A    Of his words?
15    Q    Yes.
16    A    No, I don't, sir.
17    Q    What was the conclusion after the --
18    A    For the recommendations?
19    Q    Yes.
20    A    The recommendations were to dismiss Michael.
21    Q    Okay.  And on what basis?
22    A    On the basis that he had violated this condition
23         of probation which he had been on, and that he had
24         -- the violation was that password exchange.
25    Q    And was that the only violation, the password
```

Page 41

```
 1        he withdrew?

 2   A    Yes, I heard that, yes.

 3   Q    Did you have any input into that?

 4   A    I don't deal with the transcript end of the school

 5        business, so no, I did not.

 6   Q    Can you tell me why in spite of your --

 7        Cranbrook's offer to withdrawal and their refusal

 8        to withdrawal why it's on his transcript that he

 9        withdrew?

10   A    I can tell you my understanding.

11   Q    Okay.

12   A    Is that appropriate?

13   Q    Sure.

14   A    My understanding of the transcript shows either

15        completion of program, which is a graduation date,

16        or a noncompletion of the program, which shows up

17        as a withdrawal date.  That's my understanding.  I

18        don't know the rationale behind that.  I know

19        that's my understanding.

20   Q    Certainly.  So you're saying it's just the matter

21        of the form only offers two options?

22   A    It's either completion of program with a

23        graduation date, or noncompletion of program which

24        is withdrawal date.

25   Q    Okay.
```

Page 42

1   A   That's my understanding.

2   Q   And who can I ask why is that?  Why isn't there an

3       option to put dismissed?

4   A   I can't answer that question.  I don't know the

5       answer to you.

6   Q   Would you agree with me that the transcript is

7       incorrect?

8   A   No, because he did not complete the graduation

9       date.  He withdrew at -- you know, he dismissed,

10      but the dismissal goes towards a withdrawal date

11      because it's a noncompletion of the program.

12  Q   Then what is the point of offering a withdrawal?

13  A   In the vernacular of the school, the withdrawal

14      avoids the process of Conduct Review Board, and in

15      which case some families decide to do that.

16  Q   Okay.  If he -- I don't -- you did answer my

17      question, but that is not really what I was

18      asking.

19  A   Okay.

20  Q   You offered withdrawal.

21  A   Yes.

22  Q   He refused.

23  A   That's correct.

24  Q   He was dismissed.

25  A   That's correct.

1    Q    (Continuing by Mr. Sciotti)  On June 1st, 2004 you

2         wrote a letter to the Dupree's indicating that

3         Michael had been dismissed from Cranbrook --

4    A    Uh-huh.

5    Q    -- as of June 1st, 2004.

6    A    Uh-huh.

7    Q    What were the reasons that you didn't spell out

8         why he was dismissed?

9    A    Because of the violation of the rule regarding the

10        password.

11   Q    No, my question is in the letter of June 1st why

12        didn't you tell the Dupree's?  It's not an

13        exhibit.

14   A    Oh.

15   Q    I can dig it out for you.

16   A    No, I kind of -- I think I remember.

17                         MR. LINDEN:  Maybe it would be

18        helpful if you dig it out.

19                         MR. SCIOTTI:  Okay.  I think

20        it might be attached to my complaint, actually.

21                         THE WITNESS:  I think it was

22        just a two sentence letter --

23   Q    (Continuing by Mr. Sciotti)  Yeah, it was.

24   A    -- to answer your question.

25                         MR. LINDEN:  Well, hold on a

1       second, let's just wait.

2                           MR. SCIOTTI:  I think I can

3       find it.

4                           Yes, here it is.

5    Q  (Continuing by Mr. Sciotti)  Just take a look at

6       it.  This is attached to my complaint --

7    A  Okay.

8    Q  -- as Exhibit B.  And do you recognize that

9       letter?

10   A  Yes, sir.  Yes.

11   Q  So my question is, you tell the Dupree's that

12      Michael, Jr.'s been dismissed as of June 1st,

13      2004.  My question is, why didn't you explain in

14      the letter the reasons he was dismissed?

15   A  This is the kind of standard procedural letter

16      that I utilize with a dismissal or withdrawal.  I

17      don't state the reasons.

18   Q  Well, and why?

19   A  Just the way we operate the business there.  It's

20      no use to put that reason down because the family

21      has been engaged in conversations about the reason

22      for the procedures already.

23   Q  If you contrast that with Exhibit Number 2.

24   A  Uh-huh.

25   Q  Exhibit Number 2 is the letter --