# MICHAEL DUPREE, SR.
# DEPOSITION TRANSCRIPT

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN


MICHAEL DUPREE, JR.,                Case No.

a Colorado Resident,

MICHAEL DUPREE, SR.,          2:10-CV-12094-LPZ-MKM

and DARLENE DUPREE, his parents,

Residents of the Country of Austria,

    Plaintiffs,

    vs.

CRANBROOK EDUCATIONAL COMMUNITY,

JOHN J. WINTER, and CHARLES SHAW,

    Defendants.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _/

        The Deposition of MICHAEL DUPREE,

SR., a Plaintiff in the above-entitled cause,

taken by Shari J. Pavlovich, CSR-5926, Certified

Shorthand Reporter, Registered Professional

Reporter, Certified Realtime Reporter, and Notary

Public for the County of Wayne, acting in the

County of Macomb, State of Michigan, at 24825

Little Mack, St. Clair Shores, Michigan, on

Tuesday, December 14, 2010 commencing about 2:06

p.m., pursuant to the Federal Rules of Civil

Procedure.

Page 9

```
 1          each one of them?

 2     Q    Did you obtain an undergraduate degree?

 3     A    Yes.

 4     Q    Where did you get your undergraduate degree from?

 5     A    University of Florida.

 6     Q    What year would that have been?

 7     A    1969.

 8     Q    Do you have a law degree?

 9     A    Yes.

10     Q    What year did you get your law degree?

11     A    1972.

12     Q    Have you ever practiced law?

13     A    Yes.

14     Q    When did you last practice law?

15     A    Approximately 1976.

16     Q    Are you currently a member of any state bar?

17     A    Yes.

18     Q    What states?

19     A    Florida.

20     Q    Have you ever been a member of the Michigan bar?

21     A    No.

22     Q    How old is Michael?

23     A    I think he's 25.

24     Q    Do you know his date of birth?

25     A    Yes.
```

Page 10

1    Q    What is it?

2    A    August 27th, 1985.

3    Q    And what's Matthew's date of birth?

4    A    September 16th, 1988.

5    Q    When did Michael commence going to school at

6         Cranbrook?

7    A    In his freshman year.  I think that was the year

8         2000.

9    Q    And where was he previously at school just before

10        that?

11   A    Edlin and it's a private school in Virginia.

12   Q    Were you living in Virginia at the time?

13   A    Yes.

14   Q    And so did you relocate for work here in Michigan?

15   A    Yes.

16   Q    And you would have been working for General Dynamics

17        at the time?

18   A    Yes.

19   Q    Okay.  And when Michael enrolled at Cranbrook in

20        2000 did Matthew also enroll at the same time?

21   A    Yes.

22   Q    And do you remember, Mr. Dupree, when you originally

23        enrolled both your sons at Cranbrook, did you sign

24        enrollment agreements for both of them?

25   A    Yes.  Either my wife or I signed them.  I think I

1  A   That's what it says, yes.

2  Q   This is the enrollment agreement for your son to

3      attend Cranbrook for his senior year, which would

4      have been academic year 2003-2004; correct?

5  A   Yes.

6  Q   Now, in this lawsuit you have a number of

7      claims; correct, Mr. Dupree?

8  A   Yes.

9  Q   One of the claims is a breach of contract claim;

10     correct?

11 A   Yes.

12 Q   And so what I want to talk about now briefly is your

13     breach of contract claim so I can get a full

14     understanding of your breach of contract claim.

15              Beyond the enrollment agreement, are

16     you claiming there are any other documents that

17     constitute the contract that you're claiming

18     Cranbrook breached?

19 A   Not that I can think of at this moment.

20 Q   Okay.  And during the time your sons attended

21     Cranbrook did you ever receive copies of the student

22     handbook?

23 A   May we go back to that last question?

24              MR. LINDEN:  You want to read back my

25     last question preceding that question?

Page 13

1                    (Record repeated.)

2                    THE WITNESS:   Okay.   I do want to --

3          there are -- is a couple others, I think, that are

4          relevant.   And that is each of the school years

5          since his enrollment, to me all are contracts while

6          he was there.   They're all relevant.

7    BY MR. LINDEN:

8    Q    All right.   And let me explore it a little bit

9          further, just so the record's clear in that regard.

10         When you talk about each of the years, we're talking

11         about your son Michael started attending Cranbrook

12         school year 2000-2001; correct?

13   A    That's correct.

14   Q    And for that school year you signed an enrollment

15         agreement just like Exhibit 1; correct?

16   A    Yes.

17   Q    And each of the years that Michael attended you

18         signed an enrollment agreement just like

19         Exhibit 1; correct?

20   A    Yes.

21   Q    And so what you seem to be suggesting, Mr. Dupree,

22         and I want to just make sure we're both on the same

23         page, you are now saying that all those agreements

24         in their totality constitute the contract.   Is that

25         what you're saying?

Page 14

1    A    Yes, also.

2    Q    Okay.  So beyond the enrollment agreements for each

3         of the years that Michael attended, are you claiming

4         any other documents constitute or provided a basis

5         for a contractual claim?

6    A    Not that I can think of.

7    Q    Thank you.  So one of the questions I asked you

8         before we went back was whether or not you ever

9         received copies of the student handbooks while your

10        sons were enrolled at Cranbrook.

11   A    Yes.

12   Q    Do you recall if you would have received copies for

13        each of the school years in which Michael was

14        enrolled?

15   A    I think so.

16   Q    Do you remember if you would have received a copy of

17        the school handbook for the last year he attended,

18        which would have been school year 2003-2004?

19   A    Yes.

20                       (Deposition Exhibit Number 2 was

21                        marked for identification.)

22   BY MR. LINDEN:

23   Q    All right.  I'm now going to put in front of you,

24        Mr. Dupree, what the court reporter has marked as

25        Exhibit 2, which for purposes of identification, the

```
 1        referencing, yes.
 2   Q    All right.  So if we could, Mr. Dupree, let's talk a
 3        little bit more about Exhibit 2, this community
 4        handbook.
 5   A    Sure.
 6   Q    So did you get a copy of the community handbook each
 7        year that your sons were enrolled at Cranbrook?
 8   A    To my recollection, yes.
 9   Q    And did you ever have an opportunity to review the
10        community handbook?
11   A    Yes.
12   Q    Okay.  And were you aware before Michael had his
13        problems resulting in us being here today that there
14        was a code of conduct governing students' behavior
15        at the school?
16   A    Yes.
17   Q    Let's talk a little bit more briefly about your
18        breach of contract claim so that I can sort of
19        understand it.
20                  So you're claiming that Cranbrook
21        breached the enrollment agreement; correct?
22   A    Yes.
23   Q    Okay.  How did they breach the enrollment agreement?
24   A    By specifically dismissing him from Cranbrook.
25   Q    Now, during the school year 2003-2004, was it ever
```

Page 22

1      handbook for 2004-2005 because your son Matthew was

2      still going to school there?

3  A   That's -- now that you've said that, that's exactly

4      why.

5  Q   Let's talk about Deposition Exhibit Number 3.  So

6      you recall receiving this sometime around its date,

7      March 12, 2004?

8  A   Sometime after March 12th, yes.

9  Q   And it was letting you know, among other things,

10     that Michael was being charged with violating the

11     code of conduct by -- as a result of his having in

12     his possession a marijuana pipe; correct?

13  A   Yes.

14  Q   And it lets you know that there was a conduct review

15     board hearing with respect to that allegation;

16     correct?

17  A   Yes.

18  Q   And it lets you know that the conduct review board,

19     after conducting the hearing, made a determination

20     as to the nature of the discipline that they were

21     meting out; correct?

22  A   Yes.

23  Q   And this letter lets you know that among the

24     discipline being imposed against Michael at that

25     time was that he was being placed on conduct

1      what happened at that board other than what Michael

2      might have told you; correct?

3  A   That's correct.

4  Q   Did you ever ask Michael about the nature of that

5      allegation?

6  A   Which allegation?

7  Q   The allegation about his having in his possession a

8      marijuana pipe.

9  A   Yes.

10  Q   And when did you ask him about it?

11  A   I don't recall.

12  Q   Was it -- did you ask him about it while he was

13      still enrolled at Cranbrook?

14  A   Yes.

15  Q   And what did he tell you about the allegation?

16  A   I don't recall.

17  Q   Let's switch gears for a moment.  After Michael was

18      dismissed from Cranbrook, as I understand it, he

19      obtained his GED?

20  A   Yes.

21  Q   Do you know when he obtained that?

22  A   Yes.  It was right after.  By June 1st, June 2nd,

23      June 3rd.  I had called to see when they had a test

24      available that he could take.  And they gave me that

25      date.  So I remember taking him for that test.

Page 26

1    Q    All right.  So when we talk about June, we're

2         talking about June of 2004?

3    A    June of 2004, that's correct.

4    Q    And so he took the GED test immediately after you

5         found out he was being dismissed by Cranbrook?

6    A    Yeah.  Might have been the first -- within the first

7         two weeks, I recollect that, of June.

8    Q    And since he obtained his GED, besides attending the

9         University of Denver, has he attended any other

10        colleges?

11   A    Yes.

12   Q    What other colleges, Mr. Dupree, has he attended?

13   A    Maybe not in exact order.  Cabot College in

14        California, California State University in

15        Sacramento, Cabrio College, University of California

16        Santa Barbara, and then the University of Denver.

17        One other, too.  Purdue, his first one.

18   Q    Did he ever attend a college by the name of Las

19        Positas?

20   A    Yeah, you know, that and Cabot College are the same.

21   Q    So the first college he would have attended after

22        getting his GED was Purdue?

23   A    That's correct.

24   Q    Now, was he accepted at Purdue before he was

25        dismissed from Cranbrook?

Page 27

1   A    Yes.

2   Q    How long did he attend Purdue for?

3   A    To about the end of October 2004.

4   Q    And do you know why he stopped attending Purdue?

5   A    Yes, I do.

6   Q    What was the reason?

7   A    He got -- he was sick.  And I forgot exactly what

8        the illness was but I went to the Purdue -- I

9        discussed it with Purdue and they said that they

10       would let him withdraw because his illness was such

11       that it was -- they were willing to let him

12       withdraw.

13  Q    So there's several other schools he attended before

14       his current enrollment at the University of Denver.

15       So these other colleges, Cabot, California State at

16       Sacramento, University of California at Santa

17       Barbara, all these other schools you enumerated, why

18       did he drop out of those schools, if you know?

19  A    Well, I don't think -- I think that's the wrong

20       characterization.  He didn't drop out of them.  I'll

21       start with he wanted to go to a four-year college.

22       So he went from Las Positas, or whatever it is, to

23       California State in Sacramento.  He didn't like

24       California State.

25                   He wanted to live more in southern

Page 49

1       you guys is -- was what they were.

2    Q  All right.  Speaking of providing, are you aware

3       that Cranbrook has produced documents in this case?

4    A  Yes.

5    Q  Have you seen any of those documents?

6    A  Yes.

7    Q  And among the documents that have been produced in

8       this case, included an investigation that Cranbrook

9       did pertaining to the computer allegation; correct?

10   A  I had a cursory look at that.  I hadn't had a chance

11      to look at it thoroughly.  I just arrived.

12   Q  So let's come back to these conversations with

13      Mr. Shaw.  So your recollection, Mr. Dupree, is you

14      had from three to six phone conversations with him?

15   A  Um-hmm, yes.

16   Q  Thank you.  Do you recall if at any of those

17      conversations Mr. Shaw let you know that they were

18      going to treat Michael's departure from school as a

19      withdrawal as opposed to a dismissal?

20   A  That's what he was saying, yes.

21   Q  What do you remember him saying?

22   A  He was saying we're going to do you a favor and

23      we're going to show him as withdrawing.  And I had

24      alerted him that -- I had sent him an e-mail, as

25      well as to Arlyce that Michael steadfastly has

1        refused to withdraw.  Did not withdraw.  And they

2        had no right to say that he is withdrawing.

3    Q   Now, at the time of these conversations with

4        Mr. Shaw that you just briefly described for us, he

5        had already been accepted to Purdue University;

6        correct?

7    A   He had.  But whether it was still acceptable was

8        still in the air.

9    Q   Well, let's come back to my question.  You would

10       agree with me at the time you had these

11       communications with Mr. Shaw where he explained to

12       you that they were going to, as you put it, do you a

13       favor and characterize his departure as a

14       withdrawal, Michael had already been accepted to

15       Purdue; correct?

16   A   Yes.  Yes, yes, yes, yes.

17   Q   What conversations, if any, do you know that

18       Cranbrook had with anybody at Purdue about Michael's

19       status after he was dismissed?

20   A   I recollect that Charlene Rencher, I believe, had a

21       conversation with them.

22   Q   Okay.  Now, when you say Charlene Rencher, she was a

23       counselor at Cranbrook?

24   A   Yes.

25   Q   And how do you know Charlene Rencher may have had a

Page 54

1  A   Yes.

2  Q   And Michael successfully enrolled at Purdue at the

3      beginning of the fall academic year 2004-2005;

4      correct?

5  A   Yes.

6  Q   So obviously in light of that, the withdrawal

7      designation on his transcript did not prevent him

8      from enrolling; correct?

9  A   Yes.

10 Q   Besides conversing with Ms. Rencher on the phone,

11     did you ever send her any e-mails?

12 A   I don't recall.

13 Q   Now, you testified earlier on when I asked you about

14     what would be denoted for the record, I was asking

15     you questions about Deposition Exhibit 3, which is

16     the March 12, 2004 letter, that letter indicated,

17     among other things, that Michael was on probation

18     through June 4th, 2004 and that he could be

19     dismissed for any further major rule violations or a

20     series of minor rule violations; correct?

21 A   Yes.

22 Q   And you would agree, Mr. Dupree, you received notice

23     that Michael was being dismissed on -- in a letter

24     dated June 1, 2004; correct?

25 A   Yes.

1   Q   You can't recall whether or not you actually did

2       meet with her?

3   A   I know we met with her prior to June the 1st and I

4       can't remember whether we met with her right after

5       June the 1st.  I think we did but I just don't

6       recall.

7   Q   Do you know if your wife met with anybody at

8       Cranbrook about your son's dismissal in June of

9       2004?

10  A   No.  If we met, I think we met together.

11  Q   You would agree, Mr. Dupree, that your son got

12      accepted to a number of colleges or universities,

13      notwithstanding the fact that the transcript

14      indicates he withdrew from Cranbrook; correct?

15  A   Yes.

16  Q   And isn't it true he was accepted to approximately

17      nine colleges?

18  A   I don't think that many.  But certainly half a

19      dozen.

20  Q   Well, let me ask you this, to maybe nail down the

21      number:  Have you seen the Answers to the

22      Interrogatories that have been submitted on your

23      behalf?

24  A   Yeah.

25  Q   All right.  So let's just talk about that.  And

Page 60

1        there?

2    A    Yes.

3    Q    Why?

4    A    He was living in Santa Cruz at the time and there

5        was -- he was accepted to University of California

6        Santa Barbara and Santa Cruz and he chose Santa

7        Barbara.

8    Q    Why did he elect not to attend the University of

9        Colorado, if you know?

10   A    He wanted to stay in California at the time.

11   Q    All right.  So you would agree, all of the schools

12       we've just talked about, with the exception of

13       Purdue, he was accepted after Cranbrook issued the

14       transcript noting withdrawal; correct?

15   A    Yes.

16   Q    Now, there were some schools he was rejected to that

17       he applied to; correct?

18   A    Yes.

19   Q    All right.  So let's talk about those schools for a

20       moment.  He applied to Babson.  Are you aware of

21       that?

22   A    Yes.

23   Q    He applied to Babson while he was still enrolled at

24       Cranbrook; correct?

25   A    Yes.

1   A   Yeah, as I understand it.

2   Q   And then you also found out Cranbrook's position was

3       that he committed another offense, violated their

4       technology use policy, among other things, and they

5       ultimately dismissed him for that?

6   A   I never understood that position.

7   Q   Well, did anybody at Cranbrook tell you why your son

8       was being deemed to have violated the terms of his

9       probation?

10  A   Yes.

11  Q   And you testified earlier that you -- in fact, you

12      and your son met with John Winter and he told you,

13      among other things, that there was some kind of

14      computer scam that they believed your son was

15      involved in?

16  A   That's correct.

17  Q   So Cranbrook let you know, did it not, that there

18      were at least two instances where they felt --

19      putting aside what you might have believed, they

20      felt that he had violated their rules; correct?

21  A   Yes.

22  Q   And you also indicated, Mr. Dupree, that Charlie --

23      Charles Shaw, after you received the letter of

24      dismissal in June of 2004, told you that he thought

25      he was doing you -- the school was doing you a favor

1          by noting that your son had withdrawn from school as

2          opposed to being dismissed; correct?

3     A    Yes.  Only after I had asked him how you could --

4          how you could say he was withdrew when he never

5          withdrew.

6     Q    Okay.  But you would agree, Cranbrook had taken the

7          position, they let you know by virtue of Exhibit 5,

8          which is the June 1, 2004 letter, that they were

9          dismissing your son from school; correct?

10    A    After he completed school, yes.

11    Q    Well, let's come back to my question.  We'll explore

12         what you just wanted to add there.

13                        You would agree with me that the

14         June 1, 2004 letter indicates as of that date,

15         Cranbrook was dismissing your son from school?

16    A    Yes.

17    Q    And you had indicated a moment ago that you -- your

18         son was going through some embarrassment explaining

19         his situation to schools that were considering him

20         for admission; correct?

21    A    Yes.

22    Q    And I sort of gather -- and I don't want to put

23         words in your mouth -- that part of the

24         embarrassment that your son was subjected to was the

25         fact that his transcript indicated that he withdrew

1       from school; correct?

2    A  Yes.  He had to explain why they had withdrew on

3       there and what it was.

4    Q  All right.  Now, were you present during the time

5       your son met with any of these admissions officers

6       at any of these colleges?

7    A  No.

8    Q  So for example, you don't know whether or not your

9       son shared with them anything about the two conduct

10      review board hearings that he was subjected to?

11   A  No, I do not.

12   Q  Okay.  And I want to explore something because

13      there's been a couple times now in your testimony

14      you've sort of explained, I believe, your position

15      being that you felt that Cranbrook could not dismiss

16      your son as of June 1, 2004?  That they could not

17      dismiss him as of June 1, 2004?

18   A  That's correct.

19   Q  I want to understand your position in that regard.

20      How do you come to that conclusion?

21   A  Because he had already completed all of the

22      requirements to graduate as reflected on his

23      transcript, which I hadn't seen.  But when I look at

24      this transcript -- but at that time, he had

25      completed all of the requirements to graduate.

1   Q   And when you talk in terms of requirements to

2       graduate, what do you mean by that?

3   A   I think the school systems in Michigan have

4       requirements to -- that if you achieve, you

5       graduate, and you'd receive a diploma.  Once you

6       receive those, once you've completed those, then

7       you've met those requirements and are entitled to a

8       diploma.

9   Q   Okay.  And Mr. Dupree, what's your basis for that

10      understanding?

11  A   Common sense, one; Number 2, if you look at most of

12      definitions of what -- what graduation means, that's

13      how it's defined.

14  Q   Okay.  So based on your understanding of common

15      sense, you are of the opinion that as of June 1,

16      2004 Cranbrook could not dismiss your son?

17  A   Well, according to enrollment agreement and the

18      definitions that are attached to it, are relating to

19      financial aid, they define what the school year is.

20      They define what withdrawal is.  They define what

21      graduation is.

22  Q   Let's talk about the enrollment agreement, which is

23      Exhibit 1.  All right.  So let's go to section one

24      of the enrollment agreement, which is Exhibit 1.

25  A   Okay.

1   Q   Section one is entitled conditions of enrollment;
2       correct?
3   A   Yes.
4   Q   And you indicated earlier on, you signed this
5       enrollment agreement for school year 2003-2004;
6       correct?
7   A   Yes.
8   Q   And it indicates, among other things, that -- I'm
9       looking now at fourth paragraph under section one,
10      that you specifically understand and agree that the
11      school reserves the right to dismiss Michael at any
12      time if, in the judgment of the school, Michael's
13      health, efforts, progress, behavior, or influence is
14      unsatisfactory or his account is past due; correct?
15  A   Yes.
16  Q   And if you look at the last paragraph in section
17      one, it also says that you understand that Michael
18      will be responsible to abiding to the policies and
19      procedures stated in the school's handbook; correct?
20  A   Precisely.
21  Q   All right.  And the school's handbook would be
22      Exhibit Number 2?
23  A   Right.
24  Q   Correct?
25  A   Yes.

1    Q    Okay.  And again, you knew as of March 12, 2004,

2         which is Exhibit 3, that the school was letting you

3         and Michael know that through June 4th of 2004 that

4         he was on probation; if he violated the terms of

5         those probations, he would be dismissed?

6    A    Yes.

7    Q    Okay.  Now, let's switch gears for a moment.  You

8         have about a half dozen claims in this lawsuit;

9         correct?

10   A    Yes.

11   Q    Okay.  One of the claims is fraud and

12        misrepresentation.  Are you aware of that,

13        Mr. Dupree?

14   A    Yes.

15   Q    Could you tell me in your own words what your fraud

16        and misrepresentation claim is?

17   A    As to the misrepresentation, the 2003-2004 handbook

18        does not specifically state -- in fact, it's very

19        clear that in my reading of it, that the -- oh,

20        let's see where I find it.  Right here.

21                   That under the highlights of the

22        Cranbrook school's technology use policy, that

23        providing -- sharing your password with another

24        person is only a violation of that policy which

25        consequences is that they can suspend your right to

1      use their computers at Cranbrook.

2   Q  Doesn't the preamble to that policy indicate that

3      it's not all inclusive?

4   A  I don't recollect if that's what it says.

5   Q  Let me direct you to it.

6   A  Okay.

7   Q  If you go to Page 99, which should be, for the

8      record, CB000763, you see above the last sentence

9      where it says:

10            "The actions listed comprise a

11           non exhaustive list of violations of

12           the school's policy on the use of its

13           technological systems."

14   A  Um-hmm.  Yes.

15   Q  Okay.  All right.  So what else are you claiming

16      supports your claim of fraud or misrepresentation?

17   A  Well, it's very clear, Cranbrook said that he was

18      being dismissed for major rule violation.  And when

19      I had talked to Mr. Winter about it during this one

20      meeting, he specifically said that he had committed

21      a major rule violation.

22            And I said, there's nothing in -- and

23      in fact, the community handbook for 2003-2004

24      specifically states nothing that -- giving the

25      password is a major rule violation and that you

1   A    Well, let's see, what other -- misrepresentation and

2        the fraud would be on the transcript.  When I told

3        them clearly from the very beginning when I first

4        heard that they were going to put withdrawal on

5        that.  I said, it's fraudulent for you to do it.

6                      Several times since that time I --

7        when they sent the transcripts to other schools, not

8        just Purdue, when they received at University of

9        California Santa Barbara, when they were received at

10       University of Colorado, it was stamped withdrawal on

11       it.

12                      I had called Cranbrook again and

13       again, and I even had my lawyer notify them that

14       this was fraud for them to misrepresent and it was

15       fraudulent for them to transport this through the

16       interstate commerce and say that he had withdrawn

17       when he had not.

18   Q    Okay.

19   A    And they need to cease and desist it.

20   Q    Okay.  So let's talk about this aspect of your fraud

21       and misrepresentation claim.  You knew in advance of

22       receiving the transcript that Cranbrook was going to

23       put on the transcript that your son had withdrawn

24       from school; correct?

25   A    I knew it and I continuously objected to it.

1   Q   I appreciate the fact that you objected to it.

2       Let's come back to my question because I want the

3       record to be clear.

4   A   Okay.

5   Q   You would agree that you knew prior to you receiving

6       your son's transcript that Cranbrook was going to

7       put on the transcript that he had withdrawn?

8   A   Yes.

9   Q   Did you ever give any written notice to any of the

10      schools that your son applied to that you were

11      contesting the notation of withdrawn on his

12      transcript?

13  A   Wait.  I did not actually know until I saw the

14      transcript that they were actually going to put

15      withdrawal on there.  Because even when I saw it,

16      even then I said well, you know, maybe they really

17      don't mean this because, back to your earlier

18      comment, when you said, you know, it's kind of --

19      we're not sure where it is.

20  Q   Right.

21  A   I just could not believe that they were actually

22      putting it.  That's the first time I really honestly

23      knew that they were going to put it on the

24      transcript, even if it was unofficial.

25                      Because I remember my wife and I

Page 79

```
 1        having that.  She says, well, maybe that's just an

 2        unofficial copy.  But it's going to be the official

 3        one they're going to show.

 4    Q   But you've testified today that you had

 5        conversations with Charlene Rencher and Charles Shaw

 6        prior to receiving the transcript in which you

 7        talked about the fact that the transcript was going

 8        to have the notation withdrawn on it; correct?

 9    A   Well, yes, I did say that.  But I'm not sure that we

10        were talking about the transcript.  They were saying

11        they were going to indicate on his records that he

12        withdrew.  I might not remember with clarity that it

13        was -- that that was the transcript at the time.  It

14        was -- I knew it was the records.

15    Q   Okay.  So regardless, you do recall that somebody

16        from Cranbrook told you in advance of your receipt

17        of the transcript that Michael's records were going

18        to reflect that he had been withdrawn from school?

19    A   That's correct.

20                        MR. LINDEN:  Let's take a break for a

21        moment.

22                        (Short recess taken at 3:55

23                        p.m.)

24                        (Back on the record at 4:04

25                        p.m.)
```

Page 80

1   BY MR. LINDEN:

2   Q   In the school year 2003-2004, did you ever

3       participate in Cranbrook's tuition refund program?

4   A   I was aware of it but it didn't -- I read through it

5       but I did not participate in it.

6   Q   So coming back to a complete understanding of your

7       fraud and misrepresentation claim, other than what

8       you've already explained, what else supports your

9       claim of fraud and misrepresentation?

10  A   At this time I can't recall any other things.

11  Q   Okay.  Now, are you aware another one of your claims

12      in this case is mail fraud?

13  A   Yes.

14  Q   Okay.  And what are the facts supporting your mail

15      fraud claim?

16  A   The transmission of the transcript to colleges

17      indicating that he withdrew is a violation of Mail

18      Fraud Act.

19  Q   When did you first find out that Cranbrook was

20      transmitting that transcript with the withdrawal

21      notation on it?

22  A   When I checked into the -- when he first applied --

23      I know one of the times when I applied to the

24      University of Colorado and I had them -- I had

25      called the University of Colorado and to ask them if

Page 83

1        college education?

2    A   Yeah.  I think it was in the spring or summer of

3        2005.  He took one course at either that Las

4        Positas.  It's a community college.  California

5        State Cabrio or Las Positas.

6    Q   And with respect to the transmittal of Michael's

7        transcript from Cranbrook after he was dismissed,

8        did he request that transcript to be transmitted to

9        these colleges?

10   A   I would say the colleges required him to have them

11       sent.

12   Q   And so he went about doing whatever he had to do to

13       have the transcripts sent?

14   A   That's correct.  Now, just to clarify, I could have

15       done that for him.  He could have said hey, dad, can

16       you call Cranbrook and ask them to forward the

17       transcripts or apply to them to do that?  I would

18       say yeah, if he had asked me.

19   Q   But he never asked you?

20   A   I think he probably did on a couple of occasions.

21       Whether it was those, I don't know.  But there was a

22       couple of the colleges that -- I talked to somebody

23       at Cranbrook to send that I was sending a request

24       for transcripts to be sent.

25   Q   So there were a couple of colleges, you can't recall

Page 84

1   specifically which colleges they were, that you

2   contacted Cranbrook on your son's behalf --

3 A   Yes.

4 Q   -- and authorized them to send his transcripts to

5   those colleges?

6 A   Yes.  With withdrawn on it and all.  I had no

7   choice.

8 Q   Do you know if your son ever provided any of the

9   colleges he applied to a written explanation as to

10   his contentions about the withdrawal status on his

11   transcript?

12 A   I can't speak to that.

13 Q   Did you ever do so on your son's behalf?

14 A   No.

15 Q   Did you ever have anybody do that on your son's

16   behalf?

17 A   No.

18 Q   So again, in sum, your mail fraud claim consists of

19   your allegation that Cranbrook transmitted Michael's

20   transcript to all these various colleges he's

21   applied to?

22 A   Knowing it was fraudulent, yes.

23 Q   Did you ever instruct Cranbrook not to send the

24   transcripts anywhere?

25 A   Yes.

Page 85

1   Q   Who did you instruct at Cranbrook not to send the

2       transcript?

3   A   No.  I didn't instruct them not to send it.  I told

4       them to correct the transcript.

5   Q   All right.  But my question was:  Did you ever

6       instruct anybody at Cranbrook to not send Michael's

7       transcript to any college that he applied to?

8   A   No.

9   Q   Do you recall whether either you or your wife ever

10      signed a permission to release Michael's educational

11      records from Cranbrook?

12  A   Oh, I would have done that.  If I was asked, yeah, I

13      would have done that.  If it was on his behalf and

14      something he wanted me to do, yes.

15  Q   All right.  Now, you also have a claim for wire

16      fraud in this case?

17  A   Yeah.  Yes.

18  Q   Let's -- Mr. Dupree, let's just talk briefly about

19      that.  So what are the facts that support your wire

20      fraud claim?

21  A   I thought that's what we just went through.

22  Q   No, we were talking about mail fraud.

23  A   The wire fraud is the same thing, transmitting -- as

24      they would say, it could be wireless now, but the

25      same basis.  Through the U.S. mails or through other

Page 86

```
 1        means.
 2   Q    All right.  And again, the fraud is, from your
 3        position, the fact that the transcript notes
 4        withdrawn; correct?
 5   A    Yes.
 6   Q    All right.  And you also have a claim for extortion?
 7   A    Yes.
 8   Q    So tell me, what are the facts that support your
 9        extortion claim?
10   A    Mainly Dean Winter, -- let me think about this for a
11        second.
12   Q    Take your time.
13                       (Witness conferring with attorney.)
14   BY MR. LINDEN:
15   Q    Let me interrupt, Mr. Dupree.  You're going to have
16        to remember this.  If you need to take a couple
17        minutes to think about it, be my guest.  But you
18        can't consult with your attorney and try to
19        remember.
20   A    All right.
21   Q    Do you remember what the facts are to support your
22        extortion claim?
23   A    Not at this time.
24   Q    Are you familiar with the RICO statute?
25   A    I'm aware of the RICO statute, yes.  I'm not that
```

1          specific to its terms.

2    Q     Do you have a RICO claim against Cranbrook and

3          Mr. Winter, Mr. Shaw in this case?

4    A     Yes.

5    Q     Can you tell me what the facts are to support your

6          RICO claim against my clients?

7    A     Not at this time.

8                         MR. SCIOTTI:  I should note for the

9          record that I prepared the Complaint.  I signed the

10         Complaint.  He did not.

11                        MR. LINDEN:  Thank you.  I appreciate

12         that.

13   BY MR. LINDEN:

14   Q     But you indicated earlier on in your deposition, you

15         reviewed the Complaint at some point; correct?

16   A     Yes.

17   Q     Did you review it before it was filed?

18   A     I looked at it -- did I review it -- yes.  I

19         reviewed a draft of it.

20   Q     What, if anything, did you do to prepare for today's

21         deposition?

22   A     I -- last night for about an hour and a half I

23         reviewed the files that you -- that Cranbrook

24         provided, the documents that Cranbrook provided and

25         I looked over the -- some of the Interrogatories.  I

1      the time that Ali supposedly had this discussion

2      with Dean Winter?

3   A   No.

4   Q   Did he indicate, that is Ali, when he supposedly had

5      this discussion with Dean Winter?

6   A   Yeah.  This was in June.  I recollect that he had

7      been asked by Dean Winter the same types of

8      questions in May.

9   Q   Now, with respect to the conduct review board

10      hearing that took place in March of 2004, which

11      resulted in Michael being placed on suspension, are

12      you aware of what Michael might have told the

13      conduct review board about his use of marijuana?

14   A   No.

15   Q   Okay.  Did anybody at Cranbrook ever threaten you or

16      Mrs. Dupree with criminal prosecution?

17   A   No.  I'm trying to think when we met with Shaw and

18      Winter and I forget the other guy's name.  She'll

19      remember.  My wife will remember.

20   Q   Pickett?

21   A   Yeah, Pickett, thank you.

22   Q   You're welcome.

23   A   There was that -- I vaguely remember they were

24      talking about how this was a serious offense and

25      could have criminal implications.  But your question

1     ever seen written studies in that regard?

2  A  I know what you're talking about and I looked at the

3     study that that was referencing, yes.

4  Q  What would that study be, Mr. Dupree?

5  A  I don't recall the name of it now.

6  Q  Do you have a copy of that study somewhere?

7  A  No.

8  Q  With respect to the colleges that your son got

9     rejected from, is it your position he was rejected

10    by those schools because he had a GED?

11 A  I can't say with specificity that it was, no.

12 Q  Okay.

13 A  The fact that he has a GED will follow him through

14    all his life as opposed to receiving the diploma.

15 Q  Well, let's talk about that for a moment.  You would

16    agree with me that he got accepted to all the

17    colleges we talked to, notwithstanding the fact that

18    he got a GED and not a diploma; correct?

19 A  Yes.

20 Q  And as you already indicated, you don't know whether

21    or not the fact that he got a GED was a factor as to

22    why he was rejected by the colleges he was rejected

23    by; correct?

24 A  Yes.

25 Q  Did either you or your wife take notes or prepare